NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0556n.06
Nos. 15-3618/15-3643

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Oct 03, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff-Appellee,** | ) | |
| | ) | **ON APPEAL** FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE NORTHERN |
| RASHID L. CARTER; | ) | DISTRICT OF OHIO |
| CHANDA E. WILSON, | ) | |
| | ) | |
| **Defendants-Appellants.** | ) | **OPINION** |
| | ) | |

**BEFORE: NORRIS, McKEAGUE, and WHITE, Circuit Judges.**

**ALAN E. NORRIS, Circuit Judge.** This is a heroin conspiracy case that included multiple defendants. Defendant Rashid Carter appeals the district court's denial of his pre-trial motion to suppress evidence. Defendant Chanda Wilson appeals her 37-month within Guideline sentence. We affirm the judgment in Carter's case. We vacate Wilson's sentence and remand for resentencing under amended U.S.S.G. § 3B1.2.

**I.**

**A.      Background**

The Federal Bureau of Investigation ("FBI") investigated defendants and thirteen others for a suspected drug trafficking conspiracy in the Akron, Ohio, area that spanned from August 2013 through July 2014. (R. 181, PageID# 713; R. 392, PageID# 2578, 2585.) As part of the investigation, the FBI obtained court authorization to monitor calls and GPS location data for Mr. Carter's cell phone. (R. 392, PageID# 2578.) Based on certain phone calls, the FBI

concluded that Mr. Carter intended to travel from Akron, Ohio, to Chicago, Illinois, to purchase a new supply of heroin. (*Id.*, PageID# 2579.)

Mr. Carter and Ms. Wilson are cousins. Some of the intercepted calls included conversations between Mr. Carter and Ms. Wilson in mid-May 2014. (R. 295, PageID# 1705-07.) The calls revealed that Ms. Wilson acted as a broker between Mr. Carter and a drug dealer whom she knew. During one conversation, Mr. Carter and Ms. Wilson discussed when Mr. Carter would arrive in Chicago for this trip. Ms. Wilson said, "Okay, I got you. For the same thing [the same amount of heroin as previous purchase]?" (*Id.*) Mr. Carter responded, "Uh, uh, a little more." (*Id.*)

## B.     Suppression Hearing

On January 9, 2015, the district court held a suppression hearing. (R. 392, PageID# 2572.) The following factual background comes from testimony given at that hearing.

In response to the conversations between Mr. Carter and Ms. Wilson, the FBI initiated physical surveillance of Mr. Carter. (*Id.*, PageID# 2579-80.) On May 14, 2014, FBI Special Agent Timothy Edquist saw Mr. Carter leave the Akron area in a black Dodge Avenger, and GPS data for Mr. Carter's cell phone confirmed that he was travelling to Chicago. (*Id.*, PageID# 2580.) After learning that Mr. Carter was returning to Ohio, Edquist contacted Sergeant Neil Laughlin of the Ohio State Highway Patrol ("OSHP") and requested assistance with a potential traffic stop involving drug trafficking. (*Id.*, PageID# 2581-2.)

Laughlin responded with his partner, Trooper Kaitlyn Griffith. (*Id.*, PageID# 2597-99.) Laughlin testified that he used an LT 20-20 laser to determine that Mr. Carter's car was traveling at fifty-seven miles per hour, seven miles per hour over the posted speed limit in a construction

zone. (*Id.*, PageID# 2629-32.) Then Laughlin pulled onto the highway and began pacing[1] the Avenger. (*Id.*, PageID# 2632.)

Laughlin testified that he observed that the Avenger "was still traveling above the speed limit, between 76 and 80 – 82 miles per hour" in a seventy mile per hour zone. (*Id.*, PageID# 2632.) Laughlin also testified that he noticed that "the rear license plate on the vehicle was missing its county and registration sticker." (*Id.*) Griffith testified that she observed the Avenger travelling between seventy-six and seventy-seven miles an hour. (*Id.*, PageID# 2600.)

Laughlin initiated a traffic stop. (*Id.*, PageID# 2600, 2632.) Mr. Carter was driving the car, and a woman named Jasmine Sanders was in the passenger seat. Griffith approached the passenger side of the car and told the occupants that they had been seen speeding in a fifty mile per hour zone. (*Id.*, PageID# 2600-01.) Mr. Carter responded that he thought he was going fifty-five miles per hour. Griffith testified that Ms. Sanders' hands were shaking, she was breathing heavily, and she appeared more nervous than someone would in a routine traffic stop. (*Id.*, PageID# 2601-02.) Griffith also reported that she "smelled the immediate odor of raw marijuana coming from within the vehicle." (*Id.*) After smelling the marijuana, Griffith asked Mr. Carter and Ms. Sanders to get out of the car.

Laughlin testified that he also smelled "the distinct odor of raw marijuana" when Mr. Carter exited the vehicle. (*Id.*, PageID# 2633.) Laughlin testified that he had been a trooper for fourteen years and encountered the smell of marijuana thousands of times. (*Id.*, PageID# 2633.)

---

[1] Pacing occurs when law enforcement follows and maintains a constant distance from a target vehicle in order to determine its speed.

Griffith asked Ms. Sanders if she could perform a pat-down of her and Ms. Sanders consented. (*Id*., PageID# 2604.) Griffith found a small baggie of marijuana in her shirt pocket. (*Id*., PageID# 2604, 2619-20.)

During that time, Trooper Shane Morrow arrived at the scene. Laughlin then searched the car with Morrow and found "a shiny revolver pistol" in plain view, "a marijuana rolled cigar," and a "large amount of heroin" in Ms. Sanders's purse. (*Id*., PageID# 2636-37.)

The traffic stop and search were recorded on an OSHP cruiser camera.

## C.    Procedural History

On July 22, 2014, a federal grand jury in the Northern District of Ohio returned a forty-count superseding indictment charging Mr. Carter, Ms. Wilson, and thirteen other persons with conspiring to possess with the intent to distribute heroin, using a communications facility to facilitate a drug conspiracy, and traveling in interstate commerce to facilitate a drug conspiracy, in violation of 21 U.S.C. §§ 846 and 843(b), and 18 U.S.C. § 1952, respectively. (R. 16, PageID# 93-95, 98.) Mr. Carter was also charged with distributing heroin, possessing a firearm in furtherance of a drug-trafficking crime, and being a convicted felon in possession of firearms, in violation of 21 U.S.C. § 841(a)(1), and 18 U.S.C. §§ 924(c) and 922(g)(1), respectively. (R. 16, PageID 96-97, 98, 99.)

Mr. Carter moved to suppress physical evidence seized during the traffic stop. (R. 126, PageID# 441.) The district court denied Mr. Carter's motion, concluding that probable cause supported the traffic stop and search. (R. 181, PageID# 713.) Mr. Carter subsequently pleaded guilty to Conspiracy to Distribute 100 Grams or More of a Substance Containing Heroin in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(i), and Possessing a Firearm in Furtherance of a Drug Trafficking Crime in violation of 18 U.S.C. § 924(c)(1)(A). The district court sentenced

Mr. Carter to consecutive terms of 120 and 60 months of imprisonment respectively. (R. 360, PageID 2421.)

As part of his plea agreement, Mr. Carter expressly reserved the right to challenge the district court's denial of his motion to suppress evidence. (R. 295, PageID# 1679.)

On February 5, 2015, Ms. Wilson pleaded guilty to all three counts with which she was charged. (R. 301, PageID# 1750.) She did not enter into a plea agreement.

A sentencing hearing was held on May 28, 2015. At the hearing, Ms. Wilson challenged the district court's decision to sentence her based on a drug quantity of between 400 and 700 grams of heroin, because Mr. Carter was caught with roughly 250 grams of heroin. (R. 351, PageID# 2313). Ms. Wilson also argued that she should be afforded a base offense level reduction pursuant to U.S.S.G. § 3B1.2 because she was only a minor participant in the conspiracy. (*Id.*) The district court disagreed on both points, finding that a preponderance of the evidence established the drug quantity (R. 394, PageID# 2725) and that Ms. Wilson was not a minor player. (R. 394, PageID# 2729). The district court sentenced Ms. Wilson to concurrent prison terms of thirty-seven months on each count, followed by three years of supervised release. (R. 394, PageID# 2748.)

**II.**

On appeal, Mr. Carter challenges the district court's order denying his motion to suppress. For her part, Ms. Wilson appeals her sentence. Specifically she challenges (1) the district court's finding that she was not a minor participant; (2) the drug quantity calculation; and (3) the reasonableness of her sentence.

When considering the denial of a motion to suppress evidence, we review the district court's findings of fact for clear error and its conclusions of law de novo. *United States v. Gross*,

550 F.3d 578, 582 (6th Cir. 2008). A factual finding is clearly erroneous when the reviewing court is left with a definite and firm conviction that a mistake has been committed. *United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010). "In reviewing the district court's findings of fact, we consider evidence in the light most favorable to the government." *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999).

We review a district court's sentencing guideline calculation de novo, *United States v. Wendlandt*, 714 F.3d 388, 393 (6th Cir. 2013), and the reasonableness of a sentence for abuse of discretion, *Gall v. United States*, 552 U.S. 38, 51 (2007).

## A.     Suppression of Evidence

### 1.     The Initial Traffic Stop

The district court concluded that "[b]ased on Laughlin's observation of the laser device's reading and both officers' observations of the speed at which they paced [Mr.] Carter's vehicle, probable cause existed for Griffith and Laughlin to stop [Mr.] Carter." (R. 181, PageID# 718.) The district court also relied on Mr. Carter's admission to speeding. (*Id.*, PageID# 720.) Mr. Carter challenges each of these findings, arguing that the district court improperly found probable cause existed to conduct the traffic stop based on the fact he was speeding. We disagree and affirm the district court.

All of the issues presented by Mr. Carter "are issues of fact, which will be overruled only if the district court's findings were clearly erroneous." *United States v. Ivy*, 165 F.3d 397, 401 (6th Cir. 1998) (citing *United States v. Rose*, 889 F.2d 1490, 1494 (6th Cir. 1989)). "[S]o long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful." *United States v. Freeman*, 209 F.3d 464, 466 (6th Cir. 2000) (quoting *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993)). Driving over the speed

limit is a traffic violation and provides an officer with probable cause to stop a vehicle. *See United States v. Wellman*, 185 F.3d 651, 655–56 (6th Cir. 1999).

First, Mr. Carter challenges the reliability of the laser because Griffith did not remember the exact date that the laser had been calibrated before the traffic stop. But, as the district court noted, Ohio courts have recognized the reliability of readings taken from the LTI 20-20. *See, e.g.*, *State v. Starks*, 964 N.E.2d 1058, 1060 (Ohio Ct. App. 2011) ("This court has previously recognized that a trial court may take judicial notice of the scientific reliability of the LTI 20-20 laser device."); *City of Columbus v. Dawson*, No. 99AP-589, 2000 WL 271766, at *2 (Ohio Ct. App. Mar. 14, 2000) (observing that the LTI 20-20 has been recognized as scientifically reliable in other Ohio appellate courts, but declining to take judicial notice of those decisions because "the fact that a court has taken judicial notice in one jurisdiction cannot serve as the basis for taking judicial notice in another jurisdiction"); *State v. Dawson*, No. CA98-04-021, 1998 WL 883802, at *3 (Ohio Ct. App. Dec. 21, 1998) ("[W]e find that the trial court did not err by taking judicial notice as to the accuracy and dependability of the LTI 20-20 laser device . . . ."). The district court also relied on Laughlin's testimony to find that the laser was used and working properly. Thus, we do not have a definite and firm conviction that a mistake was committed when the district court relied on the laser.

Next, Mr. Carter challenges the district court's reliance on the testimony of Griffith and Laughlin to determine that they paced the car and observed it speeding. Mr. Carter argues that the camera footage reveals that the officers never paced the car and definitely did not pace the car for one quarter of a mile. But, the camera footage is not as clear as Mr. Carter alleges. It was raining on the day of the traffic stop and it is uncertain, based on the video, how long the officers could actually see the car. Mr. Carter argues that the officers never paced, or traveled at the same

speed, as his car. But the footage reveals what appears to be at least some pacing. The district court did not commit clear error in determining that the officers paced Mr. Carter's car.

Mr. Carter lastly contends that he did not admit to speeding because he only said that he "thought" he was speeding. But the traffic camera video reveals that Griffith asked Mr. Carter if he knew he was speeding, and he responded, "Yeah . . . I thought, I was going 55." Based on the camera footage, the district court did not clearly err in finding that Mr. Carter admitted to speeding.

### 2. The Vehicle Search

Mr. Carter challenges the district court's finding that probable cause existed to search the vehicle based on the smell of marijuana. Mr. Carter does not challenge any conclusions of law, but instead questions the district court's finding that the officers actually smelled marijuana. Mr. Carter notes that Griffith smelled raw marijuana, tobacco smoke, and air fresheners, while Laughlin only smelled raw marijuana. Mr. Carter contends that this inconsistency leads to the conclusion that the raw marijuana smell was fabricated. Mr. Carter further asserts that because the officers never affirmatively mention the marijuana smell on the traffic camera video, that they fabricated the smell.

The district court, however, disagreed with Mr. Carter and found the officers' testimony credible. (R. 181 PageID# 721-22.) "The district court's credibility finding carries considerable weight." *Ivy*, 165 F.3d at 401-02. "Findings of fact anchored in credibility assessment are generally not subject to reversal upon appellate review." *United States v. Taylor*, 956 F.2d 572, 576 (6th Cir. 1992). Indeed, "'[w]here there are two permissible views of the evidence, the fact finder's choice between them *cannot be clearly erroneous*.'" *Id.* (quoting *United States v. Rose*, 889 F.2d 1490, 1494 (6th Cir. 1989) (emphasis in original)).

Here, the district court found credible the officers' testimony that they smelled marijuana. The district court had the advantage of observing and assessing the officers as they testified at the suppression hearing. The district court based its credibility determination, in part, on the fact that the officers had significant experience with the smell of marijuana. Based on the record the district court's determination was not clearly erroneous.[2]

When viewed in the light most favorable to the government, this testimony demonstrates the district court did not err in finding the existence of probable cause for the stop and the subsequent search.

**B.      Ms. Wilson's Sentence**

**1.        Mitigating Role in the Offense**

Ms. Wilson argues that the court erred by failing to apply U.S.S.G. § 3B1.2 to her sentence, an application that would have reduced her base offense level by at least two levels due to her role as a minor participant in the conspiracy. She asserts that her role in the conspiracy was substantially less than others because she made no profit for her participation, had no prior involvement in drugs, and only tried to help her cousin, Mr. Carter, by making phone calls, which she now acknowledges was a poor decision.

The Guidelines provide the following framework for analyzing whether a defendant is entitled to a reduction to her sentence based upon a reduced role in the offense:

Based on the defendant's role in the offense, decrease the offense level as follows:

(a) If the defendant was a minimal participant in any criminal activity, decrease by **4** levels.

---

[2] Mr. Carter also argues that Ms. Sanders did not consent to the pat-down performed by Griffith. But, the video reveals that Ms. Sanders did in fact consent. Moreover, Griffith had the right to pat down Ms. Sanders under *Terry v. Ohio*, 392 U.S. 1 (1968), after smelling the marijuana. Most importantly, however, this pat-down has nothing to do with the search of the car because Laughlin testified to searching the car because of the marijuana smell not because of the baggie of marijuana Griffith recovered.

(b) If the defendant was a minor participant in any criminal activity, decrease by **2** levels.

In cases falling between (a) and (b), decrease by **3** levels.

U.S.S.G. § 3B1.2.

In the context of mitigating role adjustments, "a district court's factual findings are reviewed for clear error while its legal conclusions are reviewed de novo." *United States v. Roberts*, 223 F.3d 377, 380 (6th Cir. 2000). The defendant "bears the burden of proving a mitigating role in the offense by a preponderance of the evidence." *Id.* at 379.

A district court may apply U.S.S.G. § 3B1.2 to reduce a defendant's base offense level if the defendant's role in the offense was "substantially less" than other perpetrators. § 3B1.2 cmt. N.3(A). "In determining whether to award the defendant a reduction for a mitigating role in the offense, the district court must consider the portion of the relevant conduct of the conspiracy that was attributable to the defendant for purposes of determining his base offense level." *United States v. Nunnally*, 5 F. App'x 438, 440 (6th Cir. 2001).

In Ms. Wilson's case, the district court found that she did not qualify for a reduction in her offense level based upon her role in the conspiracy. Among other reasons, the court noted that Ms. Wilson's participation was not limited to a single event. Rather, she was involved in multiple purchases from beginning to end. In the court's view "but for [Ms. Wilson] and [her] Chicago connection, this poison that traveled from Cook County to the Northern District of Ohio may never have resided here." (R. 394, PageID# 2729.) The district court further described Ms. Wilson's role as "integral" and "essential." (*Id.*)

However, after the district court sentenced Ms. Wilson, Amendment 794 added the following language to Application Note 3(C) to U.S.S.G. § 3B1.2:

In determining whether to apply subsection (a) or (b), or an intermediate adjustment, the court should consider the following non-exhaustive list of factors:

> (i) the degree to which the defendant understood the scope and structure of the criminal activity;

> (ii) the degree to which the defendant participated in planning or organizing the criminal activity;

> (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

> (iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;

> (v) the degree to which the defendant stood to benefit from the criminal activity.

> For example, a defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks should be considered for an adjustment under this guideline.

> The fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative. Such a defendant may receive an adjustment under this guideline if he or she is substantially less culpable than the average participant in the criminal activity.

U.S.S.G. § 3B1.2 cmt. n.3(C) (2015).

Amendment 794 took effect on November 1, 2015, after defendant was sentenced and after the principal briefs were filed in this appeal. Counsel for defendant called it to our attention in a supplementary authority letter filed July 24, 2016.

We must first determine whether Amendment 794 applies retroactively. "[C]larifications of the guidelines have retroactive application while substantive changes do not." *United States v. Monus*, 356 F.3d 714, 718 (6th Cir. 2004) (citing *United States v. Williams*, 940 F.2d 176, 182 n.4 (6th Cir. 1991)). When deciding whether an amendment is clarifying or substantive, we consider these factors: "(1) how the Sentencing Commission characterized the amendment;

(2) whether the amendment changes the language of the guideline itself or changes only the commentary for the guideline; and (3) whether the amendment resolves an ambiguity in the original wording of the guideline." *Id.* (quoting *United States v. Hartz*, 296 F.3d 595, 599 (7th Cir. 2002)).

Regarding the second factor, the language of U.S.S.G. § 3B1.2 did not change; only the commentary changed. The remaining two factors are also met: the Sentencing Commision characterized Amendment 794 as providing "additional guidance to sentencing courts" and addressed a circuit conflict. U.S.S.G. App. C. Amend. 794. The Ninth Circuit has concluded that Amendment 794 is clarifying and therefore retroactive. *United States v. Quintero-Layva*, 823 F.3d 519, 523 (9th Cir. 2016). We agree with that decision and adopt its reasoning.

Because the district court did not have the benefit of amended U.S.S.G. § 3B1.2 at sentencing, we vacate Ms. Wilson's sentence and remand for resentencing in light of Amendment 794.

### 2. Calculation of the Drug Quantity

Ms. Wilson challenges the district court's decision to sentence her based on a drug quantity of between 400 and 700 grams of heroin because Mr. Carter was only caught with roughly 250 grams of heroin.

The argument is not well taken. A district court's factual finding of drug quantity is reviewed for clear error. *United States v. Jeross*, 521 F.3d 562, 570 (6th Cir. 2008).

The district court did not err because its drug-quantity calculation was based on a preponderance of the evidence. Where the exact amount of drugs cannot be determined, "an estimate will suffice, but . . . a preponderance of the evidence must support the estimate." *Jeross*, 521 F.3d at 570 (quoting *United States v. Walton*, 908 F.2d 1289, 1302 (6th Cir. 1990)). In

making its estimate, the court must "conclude that the defendant is more likely than not *actually* responsible for a quantity greater than or equal to the quantity for which the defendant is being held responsible." *Id*. Here, the district court found that telephone calls between Ms. Wilson and Mr. Carter indicated that Mr. Carter intended to purchase the same amount of heroin as he did last time—roughly 250 grams. Indeed, in the conversations discussing those two trips, Ms. Wilson herself explicitly referenced "250." (R. 394, PageID# 2724.) From this information, the district court found that Ms. Wilson was involved in trafficking between 400 and 700 grams of heroin. Accordingly, the district court did not err in calculating the drug quantity.

**III.**

For the reasons stated above, we **affirm** the judgment of the district court with respect to Mr. Carter. We vacate Ms. Wilson's sentence and remand for the district court to resentence her with the benefit of amended U.S.S.G. § 3B1.2.