**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 15, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JORGE MARTINEZ,

Defendant-Appellant.

and

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

ADALBERTO AGUILAR-
BANUELOS,

Defendant-Appellant.

No. 07-4040

No. 07-4063[*]

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. NO. 2:05-CR-148-TS)**

Mary C. Corporon, Corporon & Williams, P.C., Salt Lake City, Utah, for Appellant Martinez.

Ronald J. Yengich, Yengich, Rich & Xaiz, Salt Lake City, Utah, filed a brief for Appellant Aguilar-Banuelos.

---

[*] Submitted on the briefs by the Court's Order dated November 16, 2007.

Stephen J. Sorenson, Assistant United States Attorney (Brett L. Tolman, United States Attorney, with him on the brief), Office of the United States Attorney, Salt Lake City, Utah, for Appellee.

Before **KELLY**, **ANDERSON**, and **TYMKOVICH**, Circuit Judges.[**]

**TYMKOVICH**, Circuit Judge.

Utah Highway Patrol Trooper Ashton Jeffery stopped Adalberto Aguilar-Banuelos and Jorge Martinez for driving a car registered in California without a front license plate. During his interaction with the occupants, Jeffery became suspicious of possible drug smuggling, asked Aguilar-Banuelos and Martinez whether they had any guns or narcotics in the car, and then asked for consent to search the vehicle. Jeffery searched their car and discovered a bag containing over two pounds of methamphetamine.

Prior to trial, Defendants moved to suppress the drug evidence, arguing (1) the initial stop was unlawful, (2) the stop was then unlawfully extended, and (3) their consent resulted from the prior illegal detention. Relying on a magistrate judge's recommendation, the district court denied the motion to suppress. Preserving their right to appeal the suppression order, both Defendants pleaded guilty. They now separately appeal the denial of their motion to suppress.

---

[**] The Court on its own motion consolidates the two cases for purposes of this decision.

Martinez also challenges the district court's sentence, arguing he should have been granted a downward departure as a minor participant.

We consolidate the appeals and conclude (1) the initial stop was lawful, (2) the resulting discovery of drugs was inevitable since neither Defendant had a valid driver's license and the police would have conducted an inventory search after impounding the car, and (3) the district court did not commit a clear error in denying Martinez minor participant status.

Accordingly, we AFFIRM both the denial of the motion to suppress and Martinez's sentence.

## I. Background

Trooper Jeffery testified at the suppression hearing about the circumstances surrounding the incident. The following facts are undisputed.

*The Initial Stop.* In the early evening hours of March 1, 2005, Jeffery spotted a black Toyota 4Runner traveling eastbound on Interstate 80 in northern Utah. The vehicle had a California license plate on the rear, but no plate on the front. Jeffery consulted a 1998 license plate chart issued him by the Utah patrol and noted California requires passenger vehicles to display both front and rear license plates.

Jeffery briefly followed the 4Runner and turned on his emergency lights. The 4Runner pulled over. Two people were inside: Aguilar-Banuelos drove and Martinez sat in the front passenger seat. Jeffery approached the 4Runner and

asked Aguilar-Banuelos for driver's license, insurance, and registration. Neither Defendant could produce a driver's license; instead, Aguilar-Banuelos gave Jeffery a resident alien card. Unable to find the 4Runner's registration card, Aguilar-Banuelos said the car belonged to his uncle who lived in Salinas, California, which Jeffery later verified as correct. Jeffery then informed Defendants he stopped them for not displaying a front license plate, at which point Aguilar-Banuelos reached into the back seat area and produced the missing plate. Jeffery decided to issue Aguilar-Banuelos a warning ticket for failing to properly display a front license plate and for driving without a driver's license.

*The Trooper's Options Regarding the Vehicle.* Jeffery had to decide what to do about the 4Runner. He could not let either passenger drive it because neither had a driver's license. And although Jeffery could have called the registered owner—Aguilar-Banuelos's uncle—to pick up the vehicle, that would have been impractical given the owner resided in the Salinas, California area, hundreds of miles from the traffic stop. Under the circumstances, the most sensible approach was to impound the vehicle, conduct an inventory search, and provide Defendants a ride into the next town so they could arrange for transportation. The impoundment would have complied with the patrol policies and procedures. Jeffery did not intend to arrest Aguilar-Banuelos for driving without a license.

-4-

*Jeffery's Suspicion, Defendants' Consent, and the Resultant Search.*
Because Jeffery did not have enough information to issue Aguilar-Banuelos a warning ticket based on a resident alien card, Jeffery asked him to come to the patrol car and supply the necessary information. Aguilar-Banuelos complied. Jeffery patted him down for weapons and directed him to the front passenger seat.

As a result of his interaction with the Defendants, Jeffery began suspecting criminal activity—"[p]ossible illegal immigrants[,] a stolen vehicle and drug activity," 70-4063 Aplt. App. 42— based on the totality of the circumstances. Specifically, from his observations since the stop, Jeffery suspected narcotic activity "[d]ue to the behavior of both subjects, their travel plans, all the many indicators, the overwhelming odor, the electrical tape, and the air fresheners in the glove box, no luggage for their vacation." *Id.* at 42–43. While in his police car with Aguilar-Banuelos, Jeffery asked for consent to search the 4Runner. Aguilar-Banuelos responded, "yes, yes." *Id.* at 123. Jeffery then approached the 4Runner to speak with Martinez, informed Martinez of Aguilar-Banuelos's consent to search the 4Runner, and, hearing no objection from Martinez, directed both Defendants to sit in front of their vehicle during Jeffery's search. The search turned up approximately two pounds of crystal methamphetamine.

When Jeffery discovered the drugs, both Defendants fled the scene on foot. They were apprehended about half an hour later and arrested.

## II. Analysis

We turn first to the Fourth Amendment claims, which are common to both Defendants.

### A. Fourth Amendment Claims

"When reviewing a district court's decision on a motion to suppress, we 'accept the district court's factual findings unless they are clearly erroneous. The ultimate determination of reasonableness is a question of law reviewable de novo.'" *United States v. Rice*, 483 F.3d 1079, 1082 (10th Cir. 2007) (quoting *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1258 (10th Cir. 2006)).

#### 1. Legality of the Initial Stop

Defendants first challenge the lawfulness of the initial stop. Because a traffic stop itself represents a seizure under the Fourth Amendment, the stop must be justified at its inception. *United States v. Holt*, 264 F.3d 1215, 1220 (10th Cir. 2001). A traffic stop is justified at its inception "if the officer has either (1) probable cause to believe a traffic violation has occurred or (2) a reasonable articulable suspicion that 'this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction.'" *United States v. Ozbirn*, 189 F.3d 1194, 1197–98 (10th Cir. 1999) (internal citation omitted) (quoting *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (en banc)); *see also United States v. Valenzuela*, 494 F.3d 886, 888 (10th Cir. 2007).

Trooper Jeffery stopped Defendants for driving a California vehicle without displaying a front license plate. The district court concluded, "Jeffery's reliance on the apparent (as well as actual) violation of California law in failing to display two license plates was based on reasonable articulable suspicion." 07-4063 Aplt. App. 127. We agree.[1]

The relevant provision of the California Vehicle Code requires that the state "issue to the owner two partially or fully reflectorized license plates for a motor vehicle, other than a motorcycle." Cal. Veh. Code § 4850(a). And "[w]hen two license plates are issued by the department for use upon a vehicle, they shall be attached to the vehicle for which they were issued, one in the front and the other in the rear." *Id.* § 5200(a); *see also United States v. Ramstad*, 308 F.3d 1139, 1146 (10th Cir. 2002) ("California law appears to require both a front and rear license plate. . . .") (citing Section 5200); *United States v. McRae*, 81 F.3d 1528, 1530, 1533 (10th Cir. 1996) (upholding initial stop where a trooper pulled over a California vehicle "for the stated reason that both California and Utah require vehicles to have a front license plate"); *People v. Saunders*, 136 P.3d 859,

---

[1] Defendants do not challenge the authority of a Utah police officer to stop a vehicle for violation of an out-of-state equipment requirement. They merely dispute a violation has occurred. We thus have no occasion to decide whether Utah law permits law enforcement officers to enforce violations of out-of-state license plate requirements. *Cf. United States v. Ramstad*, 308 F.3d 1139, 1144 (10th Cir. 2002) (analyzing "whether Kansas law empowered [a state trooper] to stop Mr. Ramstad for driving his vehicle in Kansas without two California license plates").

863–64 (Cal. 2006) (agreeing with our analysis in *Ramstad* that California requires passenger vehicles to display both license plates).

Consistent with California statutory law and our precedent, Jeffery's Utah patrol-issued license plate chart indicated California requires vehicles to display both front and rear license plates. It is undisputed the 4Runner did not display the front license plate. And even though Jeffery admittedly did not know whether his chart, issued in 1998, reflected current law in 2005, his suspicion of a traffic violation was objectively reasonable and did not represent a mistake of law. Consequently, Jeffery was justified in stopping Defendants' vehicle because he had a reasonable articulable suspicion of a traffic or equipment violation.

Defendants argue Jeffery made a mistake of law in concluding California required two license plates. A trooper's "failure to understand the plain and unambiguous law he is charged with enforcing . . . is not objectively reasonable." *United States v. DeGasso*, 369 F.3d 1139, 1144 (10th Cir. 2004). Defendants stress California Vehicle Code Section 5200(a) by its terms applies only to vehicles for which "two license plates are issued." And "[w]hen only one license plate is issued for use upon a vehicle, it shall be attached to the rear thereof." Cal. Veh. Code § 5200(b). Defendants thus argue Trooper Jeffery could not have known the 4Runner needed to display two license plates until he stopped the vehicle and Aguilar-Banuelos produced the front license plate.

Defendants' argument on this score is unpersuasive. They fail to explain under which circumstances California would issue only one license plate to a passenger vehicle. Indeed, Sections 4850(a) and 5200(a) obviously mandate all vehicles except motorcycles receive and display two license plates. In the absence of contrary California authority, *see Saunders*, 136 P.3d at 863–64, we continue to follow our precedent in *Ramstad* and *McRae* and construe the California Vehicle Code as requiring two license plates for passenger cars.

In sum, because Jeffery observed the 4Runner in violation of the California license plate requirement, he had sufficient justification for the initial stop.[2]

### 2. Inevitable Discovery

Defendants next argue Jeffery violated their Fourth Amendment rights by unreasonably prolonging their detention and searching the 4Runner in reliance on

---

[2] Defendants also claim the stop violated their right to interstate travel. We see no merit in this argument. "The right to interstate travel protects individuals from 'statutes, rules, or regulations which unreasonably burden or restrict this movement.'" *United States v. Walraven*, 892 F.2d 972, 974 (10th Cir. 1989) (quoting *Shapiro v. Thompson*, 394 U.S. 618, 629 (1969)). Under both Utah and California traffic laws, a vehicle must display a front license plate. Cal. Veh. Code §§ 4850(a), 5200(a); Utah Code Ann. § 41-1a-404(1) ("License plates issued for a vehicle other than a motorcycle, trailer, or semitrailer shall be attached to the vehicle, one in the front and the other it the rear."). The front plate for Defendants' car was inside the vehicle; all they needed to do was attach it, *as required by California law*. A Utahan likewise would have been stopped for driving in Utah without a front license plate properly attached. Moreover, we need only glance at the patrol's license plate chart to recognize the State of Utah seeks to enforce the front license plate requirement only against those out-of-state vehicles that are required by their home state to display a front license plate. We thus see no burden, much less an unreasonable one, on Defendants' right to interstate travel.

an invalid consent (consent tainted by prior illegal stop and detention). Because of the inevitable discovery doctrine, however, we need not address these arguments.

"The inevitable discovery doctrine provides an exception to the exclusionary rule and permits evidence to be admitted if an independent, lawful police investigation inevitably would have discovered it." *United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir. 2005) (internal citation and quote marks omitted). The burden rests on the government to prove "by a preponderance of the evidence that the evidence at issue would have been discovered without the Fourth Amendment violation." *Id.* In regard to roadside car searches, "[i]f evidence seized unlawfully would have been inevitably discovered in a subsequent inventory search, such evidence would be admissible." *United States v. Tueller*, 349 F.3d 1239, 1243 (10th Cir. 2003) (quoting *United States v. Ibarra*, 955 F.2d 1405, 1410 (10th Cir. 1992)).

A lawful inventory search promotes three administrative purposes: "the protection of the owner's property while it remains in police custody, the protection of the police against claims or disputes over lost or stolen property, and the protection of the police from potential danger." *Id.* (quoting *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976)). To prove the seized evidence would have been inevitably discovered, the government can rely on a hypothetical inventory search, but only if such a search would not have transgressed its administrative purposes. *Id.* In other words, "an inventory search must not be a ruse for a

general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4 (1990).

In this case, Defendants do not dispute Jeffery would have impounded the 4Runner and conducted an inventory search because neither Defendant could produce a driver's license. Instead, they argue the evidence does not support the conclusion that a standard inventory search would have revealed the drug evidence. We disagree.

After opening the hatch in the rear of the 4Runner, Trooper Jeffery removed a blanket, a spare tire, and an unconnected speaker box. He then spotted "a compartment that had a crack with some duct tape coming out of the compartment with just this little opener things [sic]." 07-4063 Aplt. App. 85. After Jeffery opened the compartment, he "noticed there was a ziplock bag with foil bags inside of it." *Id.* The foil bags contained the seized drugs.

An inventory search aimed at documenting all of Defendants' property left in the 4Runner would have reasonably encompassed checking a compartment with the attached openers. We thus agree with the magistrate judge, "the government has proved by a preponderance of the evidence the illegal narcotics would have been inevitably found in the car through the [Utah patrol] inventory search." *Id.* at 139.

Defendants' reliance on our opinion in *United States v. Lugo*, 978 F.2d 631 (10th Cir. 1992), does not lead to a contrary result. There, we held "searching

behind the door panel of a vehicle does not qualify as 'standard police procedure.'" *Id.* at 637. We need not belabor the point that opening a visible storage compartment is different from prying open car door panels not meant to be opened.

In sum, the inevitable discovery doctrine makes our resolution of the remaining Fourth Amendment arguments unnecessary. The district court properly denied the motion to suppress the drug evidence.

### B. Martinez's Sentencing Claim

Martinez also argues the district court erred by denying him minor participant status, which would have reduced his offense level by two points. We find no clear error in the district court's decision.

### 1. Background

On November 2, 2006, Martinez pleaded guilty to possessing with intent to distribute 872.3 grams of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. The government prepared a Presentence Report (PSR), which related the following: Martinez accepted full responsibility by admitting he and Aguilar-Banuelos possessed methamphetamine with intent to distribute. Martinez stated he and Aguilar-Banuelos were going to receive a total payment of $2,000 for delivering the drugs. Martinez knew the drugs were inside the 4Runner.

The PSR calculated a base offense level of 36 and, after a downward adjustment for acceptance of responsibility, arrived at a total offense level of 34.

Martinez, with no prior convictions, had a criminal history score of zero. A criminal history score of zero (category I) and a total offense level of 34 yielded a guidelines imprisonment range of 151–188 months. Under the applicable statute, 21 U.S.C. § 841, the maximum term of imprisonment for Martinez's offense is life.

Martinez filed two objections to the PSR. Martinez first argued he should receive the safety valve adjustment under the United States Sentencing Guidelines (USSG) §§ 5C1.2 and 2D1.1(b)(7), reducing his offense level by two points. The district court granted the adjustment and recalculated the advisory range as 121–151 months. Second, Martinez argued he should receive a minor participant adjustment under USSG § 3B1.2(b)—a reduction of two points in Martinez's offense level—because of his minor role "as compared to [Aguilar-Banuelos] and as compared to the whole chain of the transaction." 07-4040 R., Vol. III at 8. The district court denied the minor participant adjustment, but granted Martinez's request for a downward variance and sentenced him to 119 months incarceration, two months below the advisory guidelines range.

On appeal, Martinez challenges the district court's denial of a downward departure based on his asserted minor participation in the crime. A minor participant adjustment under USSG § 3B1.2(b) applies only to "a defendant who plays a part in committing the offense that makes him *substantially less culpable* than the average participant." USSG § 3B1.2 cmt. n.3(A) (emphasis added). The

determination is "heavily dependent upon the facts of the particular case," and the district court, "in weighing the totality of the circumstances, is not required to find, based solely on the defendant's bare assertion, that such a role adjustment is warranted." *Id.* at n.3(C).

Martinez challenges only the procedural reasonableness of the district court's application of the Guidelines. *United States v. Fonseca*, 473 F.3d 1109, 1112 (10th Cir. 2007) ("A direct challenge to the district court's denial of a downward departure is . . . treated as a [procedural] challenge. . . ."). As the Supreme Court has directed us in reviewing challenges to procedural reasonableness, we must ensure

> the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range.

*Gall v. United States*, 128 S. Ct. 586, 597 (2007). We defer to the district court's application of the Guidelines to the facts "under an abuse-of-discretion standard." *Id.*

"[T]he abuse of discretion standard consists of component parts, affording greater deference to findings of fact (clearly erroneous) than to conclusions of law (erroneous)." *United States v. McComb*, No. 07-5003, 2007 WL 4393142, at *3 n.4 (10th Cir. Dec. 18, 2007). We have previously explained a defendant bears the

-14-

burden of proving by a preponderance of the evidence whether an adjustment under USSG § 3B1.2 is warranted. *United States v. Virgen-Chavarin*, 350 F.3d 1122, 1131 (10th Cir. 2003). Because denial of a minor participant status represents a finding of fact, we review the district court's decision for clear error. *Id.*

### 2. *Application to Martinez*

The district court committed no error in concluding Martinez did not qualify as a minor participant.

Martinez claims he was a minor participant for two reasons: (1) he was less culpable than Aguilar-Banuelos, and (2) both Defendants were mere mules in the larger drug operation. Neither argument is persuasive.

The district court disposed of the first argument by reasoning Martinez and Aguilar-Banuelos "were fairly equal participants in the transportation of drugs in this case. Both defendants were present and agreed to transport the methamphetamine for $2,000, and both were entrusted with a large quantity of drugs. Both defendants fled the scene after they were stopped by law enforcement to avoid apprehension." 70-4040 R., Vol. III at 12. The district court thus found "no evidence to suggest [Martinez] is substantially less culpable than his co-defendant." *Id.* In order for us to disturb the district court's factual finding as clearly erroneous, we would have to conclude the finding lacks "factual support in the record," or, "after reviewing all the evidence," we would need "the definite

-15-

and firm conviction that a mistake has been made." *United States v. Phelps*, 17 F.3d 1334, 1337 (10th Cir. 1994) (internal quote marks omitted). Under this standard, we have little difficulty in concluding the district court's culpability explanation was not clearly erroneous.

Regarding Martinez's second argument, we have consistently "refused to adopt a per se rule allowing a downward adjustment based solely on a defendant's status as a drug courier." *United States v. Rangel-Arreola*, 991 F.2d 1519, 1524 (10th Cir. 1993). We explained, "[d]rug couriers are an indispensable component of drug dealing networks." *Id.* To debate whether couriers as a group are less culpable would not be productive, "akin to the old argument over which leg of a three-legged stool is the most important leg." *United States v. Carter*, 971 F.2d 597, 600 (10th Cir. 1992). The district court's decision whether to grant an adjustment under § 3B1.2 must therefore "turn[] on the defendant's culpability *relative to other participants in the crime*." *Rangel-Arreola*, 991 F.2d at 1524 (emphasis added). The district court did so.

In further support of the district court's determination, Martinez was indicted and sentenced only for the amount of drugs he personally transported. In other words, the court did not assess the total amount of narcotics involved in a larger conspiracy to traffic drugs. Martinez thus received a lower sentence than he would have as part of an overall distribution network. Accordingly, to grant Martinez an additional adjustment simply because he was a mule in a larger drug

distribution enterprise "would cede [Martinez] an undeserved windfall." *United States v. James*, 157 F.3d 1218, 1220 (10th Cir. 1998) (denying a § 3B1.2 adjustment when the defendant's "sentence was based not on the collective amount of drugs distributed by all members of the conspiracy, but only on the amount of drugs distributed by" the defendant himself).[3]

In sum, the district court did not commit clear error in concluding that Martinez was not entitled to a minor participant adjustment.[4] As between the two Defendants, Martinez was not substantially less culpable. And both were important links in an overall drug trafficking chain.

### III.  Conclusion

Accordingly, we AFFIRM the district court's denial of the motion to suppress the drug evidence. We also AFFIRM Martinez's sentence.

---

[3] Charged only with the amount of drugs he personally transported, Martinez of course was not categorically precluded from receiving a minor participant adjustment. *See* USSG § 3B1.2 cmt. n.3(A). Our holding merely reaffirms that a defendant does not deserve an adjustment based *solely* on his status as a drug courier.

[4] To the extent Martinez faults the district court for not sufficiently explaining the denial of a downward adjustment, we also find the argument without merit. The district court's extensive explanation, addressing all Martinez's arguments, went above and beyond the minimum standard prescribed in *Rita v. United States*, 127 S. Ct. 2456, 2468 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority.").