**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

   Plaintiff - Appellee,

v.

JESUS ENRIQUE MORENO,

   Defendant – Appellant.

No. 15-3051
(D.C. No. 2:13-CR-20079-CM-001)
(D. Kan.)

**ORDER AND JUDGMENT**<sup>*</sup>

Before **KELLY**, **MURPHY**, and **O'BRIEN**, Circuit Judges.

Jesus Enrique Moreno was transporting over 6 kilograms of pure

methamphetamine ("ice") from Phoenix, Arizona, to Kansas City, Kansas. It was his

third such trip, but this time he was caught. He claims his role (according to him, that of

---

 <sup>*</sup> This order and judgment is an unpublished decision, not binding precedent. 10th
Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1.
It is appropriate as it relates to law of the case, issue preclusion and claim preclusion.
Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A).
Citation to an order and judgment must be accompanied by an appropriate parenthetical
notation – (unpublished). *Id.*

a mere drug courier) was minor when compared to other participants in the criminal activity. USSG § 3B1.2(b). The district judge disagreed and so do we.

## I. Background

On June 20, 2013, Moreno and his brother Kevin were traveling East on Interstate 70 in Wyandotte County, Kansas, when a patrol officer stopped their vehicle for an illegal lane change. Moreno, the driver, informed the officer his license was suspended and his friend, Robert, rented the vehicle. He also said they were travelling from Phoenix, Arizona, in order to tour Fort Hays State University in Hays, Kansas, because Kevin was interested in attending the school.

The officer doubted Moreno's story and reasonably so—the brothers had passed the university four hours and many miles earlier. They also appeared nervous. After citing Moreno for driving with a suspended license, the officer sought and received his permission to search the vehicle; he also called for a drug-sniffing dog. Upon its arrival, the dog alerted to the vehicle. A thorough search uncovered 6.605 kilograms of 100% pure methamphetamine ("ice") hidden inside the driver's side rear interior corner panel of the rented vehicle.

After telling various stories, Moreno eventually admitted to knowing the drugs were in the vehicle. He also said he was to be paid $3,000 for the trip and had transported drugs on two prior occasions. According to his statements at the time: "a guy" imports the drugs from Mexico to Arizona; Moreno arranges for a "friend" to rent a car for him; Moreno drops the car off "somewhere;" when he later returns for the car it is

loaded with drugs; he drives the drugs from Phoenix to a "house" in Kansas City; he leaves the car with the drugs at the house and departs in a different vehicle left for him; the next day he retrieves the original vehicle, sans drugs, and returns to Arizona. (R. Vol. III at 7.)

Moreno was indicted for possession with intent to distribute more than 500 grams of methamphetamine, 21 U.S.C. § 841(a)(1), (b)(1)(A). He pled guilty without the benefit of a plea agreement. Using the 2014 edition of the United States Sentencing Guidelines Manual, the PSR calculated the base offense level as 38. *See* USSG § 2D1.1(c)(1) (establishing a base offense level of 38 if the offense involves 4.5 kilograms or more of "ice").[1] The base offense level was increased by two because the offense involved the importation of methamphetamine from Mexico to the United States. *See* USSG § 2D1.1(b)(5). Because he satisfied the requirements of USSG § 5C1.2 (the safety-valve guideline),[2] the offense level was decreased by two under USSG § 2D1.1(b)(17). Applying a three-level downward adjustment for acceptance of responsibility, USSG § 3E1.1, the total offense level was 35. With a Criminal History

---

[1] Unless otherwise indicated, all references to the guidelines in this order and judgment refer to the 2014 edition of the United States Sentencing Guidelines Manual.

[2] To be eligible under the safety-valve guideline, the defendant must (1) have no more than one criminal history point; (2) not have used violence or credible threats of violence or possessed a firearm or other dangerous weapon in connection with the offense; (3) not have been an organizer, leader, manager or supervisor in the offense; and (4) have truthfully provided to the government before sentencing all information and evidence he has concerning the offense. USSG § 5C1.2(a). Moreover, the offense must not have resulted in death or serious bodily injury to any person. *Id.*

Category of I, the advisory guideline range was 168-210 months imprisonment.

Moreno objected to the PSR's guideline computations, saying he played only a minor role in the offense and was thus entitled to a two-level downward adjustment under USSG § 3B1.2. He claimed his role in the offense was minor compared to the other participants—he did not own the drugs and his fee for transporting them was a small fraction of their total value. In the alternative, he asked the judge to vary downward to 70-87 months, the guideline range resulting from the application of a mitigating role adjustment.[3] Both the government and the probation department opposed any reduction. The district judge concurred and sentenced Moreno to 168 months imprisonment.

## II. Discussion

Before addressing Moreno's arguments, we pause to discuss the effect of a post-sentencing amendment to USSG § 3B1.2.

*A. Amendment 794*

*1. Tenth Circuit Precedent*

Section 3B1.2(b) allows a judge to reduce a defendant's offense level by two if he "was a minor participant in any criminal activity." At the time of Moreno's sentencing,

---

[3] Although the minor role downward adjustment is two levels, had Moreno received the adjustment it would have actually reduced his offense level by eight levels: (1) a two-level downward adjustment for minor role; (2) a four-level decrease under USSG § 2D1.1(a)(5) (calling for a four-level reduction if the base offense level is 38 and the defendant is entitled to a mitigating role adjustment); and (3) the elimination of the two level increase for the offense involving the importation of methamphetamine, *see* § 2D1.1(b)(5)(A) (requiring a two-level increase to the offense level if the offense involved the importation of methamphetamine and the defendant is not subject to an adjustment under § 3B1.2).

- 4 -

the commentary to § 3B1.2 provided: "[The guideline] provides a range of adjustments for a defendant who plays a part in committing the offense that makes him *substantially less culpable than the average participant*." USSG § 3B1.2, comment. (n.3(A)) (emphasis added). It described a "minor participant" as a defendant "who is *less culpable than most other participants*, but whose role could not be described as minimal." *Id.*, comment. (n.5) (emphasis added). The commentary did not specify whether defining "average participant" or "other participants" "require[d] the defendant's role to be compared with that of the other participants in the specific criminal activity or with a typical offender committing this type of offense." *United States v. Rodriguez-Padilla*, 439 F. App'x 754, 758 (10th Cir. 2011) (unpublished). We concluded both comparators were relevant. *United States v. Caruth*, 930 F.2d 811, 815 (10th Cir. 1991) ("[T]he Guidelines permit courts not only to compare a defendant's conduct with that of others in the same enterprise, but also with the conduct of an average participant in that type of crime. In other words, resort may be had to both internal and external measurements for culpability.") (citation omitted)).

### 2. Amendment 794 Does Not Apply

After Moreno's sentencing, the Sentencing Commission amended the commentary (Amendment 794) to specify only an internal comparison is permitted.[4] *See* USSG App. C, Supplement, amend. 794 (Nov. 1, 2015); USSG §§ 3B1.2, comment. (n.3(A)) (2015)

---

[4] A redline version showing the changes the Commission made to USSG § 3B1.2 is attached as Appendix A.

("[The guideline] provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant *in the criminal activity*."); 3B1.2, comment. (n.5) (2015) (describing "minor participant" as a defendant "who is less culpable than most other participants *in the criminal activity*, but whose role could not be described as minimal") (emphasis added). In doing so, it resolved a circuit split on the issue and explained: "Focusing the court's attention on the individual defendant and the other participants is more consistent with the other provisions of Chapter Three, Part B." USSG App. C, supplement, amend. 794.

The Commission also added a non-exhaustive list of factors relevant to deciding whether to apply an adjustment and, if so, the level of the adjustment.[5] Those factors include: (1) the degree to which the defendant understood the scope and structure of the criminal activity, (2) his level of planning and organization, (3) whether he held a decision-making role or influenced the decisions of others, (4) the nature and extent of his participation in the offense, and (5) the degree to which he stood to benefit from the criminal activity. *Id.*; *see also* USSG § 3B1.2, comment. (n.3(C)) (Nov. 1, 2015). According to the Commission, the amendment resulted from a study it conducted which revealed the mitigating role adjustment "is applied inconsistently and more sparingly than

---

[5] Besides allowing for a two-level minor role adjustment, § 3B1.2 provides for a four-level downward adjustment for defendants playing a minimal role in the offense and a three-level downward adjustment for those whose roles fall between minimal and minor. The guideline defines "minimal participant" as a defendant "who plays a minimal role in the criminal activity. It is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group." USSG § 3B1.2, comment. (n.4(A)).

[it] intended."  USSG App. C, supplement, amend. 794.

Moreno wants us to apply Amendment 794, arguing the judge failed to make the internal comparison it requires.  In fact, he claims we are obliged to do so.  He is wrong.  While a change in law during an appeal generally requires us to apply the new law, *see Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1184 (10th Cir. 2004), the same is not true in applying changes to the guidelines.  We normally apply the sentencing guidelines in affect at the time of sentencing, in this case, the 2014 guidelines.  USSG § 1B1.11(a); *United States v. Hicks*, 146 F.3d 1198, 1200 n.2 (10th Cir. 1998).  There is an exception for those amendments serving to clarify rather than make substantive changes.  Retroactive application of clarifying amendments is required.[6]  USSG § 1B1.11(b)(2).

"[D]istinguishing between substantive and clarifying amendments is often difficult."  *United States v. Groves*, 369 F.3d 1178, 1182-83 (10th Cir. 2004).  Generally, an amendment is clarifying if "it does not overrule existing precedent, it revises a commentary note rather than a guideline, and the authors characterized it as clarifying."  *United States v. Gigley*, 213 F.3d 503, 506 n.3 (10th Cir. 2000); *see also Groves*, 369 F.3d at 1183 (to decide whether an amendment is clarifying or substantive, we consider (1) "whether the amendment alters [our] controlling pre-amendment interpretation of the guideline," (2) "whether the amendment changes the text of the sentencing guideline or merely the accompanying commentary," and (3) "how the Sentencing Commission

---

[6] The Sentencing Commission may also specifically designate an amendment as retroactive.  Amendment 794 is not listed in USSG § 1B1.10 as having retroactive effect.

characterized the amendment"). Only the second factor weighs in favor of Amendment 794 being a clarifying amendment. The other two factors reveal it to be substantive.

To the extent a "commentary" to a "guideline" can overrule our precedent, Amendment 794 does so by eliminating one of the comparisons we looked to in determining whether a defendant was entitled to a mitigating role adjustment. Prohibiting something we deemed appropriate is substantive. *See Groves*, 369 F.3d at 1183-85 ("If a guideline amendment contradicts either the plain meaning of the preexisting guideline *or* controlling case law [in this Circuit or from the Supreme Court], that amendment is necessarily substantive.") (emphasis added); *United States v. Kissick*, 69 F.3d 1048, 1053 (10th Cir. 1995) (holding that a guideline amendment was substantive because "our Circuit had reached a conclusion contrary to the Sentencing Commission's interpretation"); *cf. United States v. Farrow*, 277 F.3d 1260, 1265 (10th Cir. 2002) (amendment was clarifying because, among other things, it did not "compel this court to overrule existing circuit precedent "); *Gigley*, 213 F.3d 503, 506 n.3 (10th Cir. 2000) (considering an amendment clarifying because, *inter alia*, it "did not overrule existing precedent in this circuit").

The Commission did not characterize the amendment as clarifying. While it said the "amendment provides additional guidance to sentencing courts," it did not expressly state it to be clarifying, as it has in other amendments. *See, e.g.*, USSG App. C, supplement, amend. 780 ("This amendment clarifies . . . ."), amend. 767 ("[The amendment] amends the Commentary to clarify . . . ."); *see also Groves*, 369 F.3d at

- 8 -

1185 (noting amendment was clarifying because Sentencing Commission <u>specifically</u> said so); *United States v. Munguia-Sanchez*, 365 F.3d 877, 881 (10th Cir. 2004) (same); *United States v. Thompson*, 281 F.3d 1088, 1092 (10th Cir. 2002) (same).  Moreover, while Amendment 794 as a whole may provide "guidance," the portion of the amendment concerning the comparison required to decide whether a defendant is entitled to a mitigating role resolved a circuit split.  In doing so, this Circuit ended up getting "the short end of the stick."  While the amendment may well guide prospective application of the guideline, it cannot do so retroactively, at least in this case.[7]

### B. Minor Role Adjustment

Moreno's argument is two-fold.  First, he complains the judge's comparison of his involvement in this case with that of co-participants (internal comparison) was inadequate.  Second, he claims entitlement to a minor role adjustment.

"In determining whether the district court correctly calculated the recommended Guidelines range, we review *de novo* the district court's legal conclusions pertaining to the Guidelines and review its factual findings . . . for clear error."  *United States v. Todd*, 515 F.3d 1128, 1135 (10th Cir. 2008).  The denial of a minor role adjustment is a

---

[7] *But see United States v. Sanchez-Villarreal*, --- F.3d ---, No. 15-41303, 2017 WL 2240297, at *4-5 (5th Cir. May 23, 2017) (Amendment 794 is clarifying); *United States v. Cruickshank*, 837 F.3d 1182, 1194 (11th Cir. 2016) (same); *United States v. Quintero-Leyva*, 823 F.3d 519, 522-24 (9th Cir. 2016) (same); *United States v. Carter*, 662 F. App'x 342, 349 (6th Cir. 2016) (unpublished) (same).  Not surprising, since Amendment 794 did not substantively overrule precedent in those circuits.  *See Groves*, 369 F.3d at 1184 ("If a guideline amendment contradicts either the plain meaning of the preexisting guideline *or* controlling case law [in this Circuit or from the Supreme Court], that amendment is necessarily substantive.") (emphasis added).

question of fact reviewed for clear error. *United States v. Martinez*, 512 F.3d 1268, 1275 (10th Cir. 2008).

### 1. Internal Comparison Was Adequate

Moreno acknowledges the judge's citation of the correct legal standard requiring an internal comparison. He also concedes the judge made factual findings as to his role in the offense and that of his co-participants. Nevertheless, he says, "the [judge]'s factual recitations were not followed by any actual legal analysis. Instead, [he] moved directly to an external case comparison." (Appellant's Reply Br. at 3.) Specifically, he complains that the judge compared him to typical couriers rather than to the individuals he nominated for comparison. We don't see it that way.

The judge explicitly compared his role to that of a typical drug courier and correctly found him to be much more than typical. While the judge did not expressly compare his conduct with that of other participants in this case, he did so implicitly by focusing on facts highlighting Moreno's deep involvement in this drug transaction, as well as his participation in the larger operation. Of particular interest were several matters: Moreno's knowledge of the details of the overall operation, his repeated drug trips from Phoenix to Kansas City (long distance and high value cargo—6.6 kilograms of 100% pure methamphetamine), and his association with those who would qualify for an "aggravating role" in the operation at both ends of the trips.[8] In particular, he noted

_____

[8] That association is important for two reasons. Such relationships are well beyond what a typical courier might have and it suggests Moreno enjoyed a high level of

(Continued . . .)

- 10 -

Moreno's meetings with Arturo Valle, the Kansas City drug distributor, and his possession of contact information for Jose Francisco Lares-Rodriguez, the drug supplier for Guillermo Villela, Jr., who used Moreno to transport the drugs from Phoenix to Valle in Kansas City. This internal comparison of roles revealed Moreno to be closely associated with the movers and shakers and not substantially less culpable than co-participants.

As Moreno recognizes, when deciding whether to apply an adjustment under the guidelines, a judge is not required to "make detailed findings, or explain why a particular adjustment . . . is or is not appropriate." *United States v. Bowen*, 437 F.3d 1009, 1019 (10th Cir. 2006) (quotation marks omitted). Only "when it is apparent from the court's optional discussion that its factual finding may be based upon an incorrect legal standard," "must [we] remand for reconsideration in light of the correct legal standard." *Id.* (quotation marks omitted). That is simply not the case here. The findings and analysis were terse, but they are adequate.

### 2. Moreno Is Not Entitled To A Minor Role Adjustment

To be eligible for a role adjustment, Moreno must establish that he was

---

trust with those higher in the distribution chain. Couriers are typically kept in the dark about the details of transactions, the identity of the high-end players, and any understanding about the overall operations. Doing so insulates the ringleaders from discovery and prosecution. Moreno's cozy relations with them at least implies a more than average level of participation in their illicit endeavors and may even suggest that he was being groomed for something more.

- 11 -

"substantially less culpable than the average participant."[9] *United States v. Salazar-Samaniega*, 361 F.3d 1271, 1277 (10th Cir. 2004) (the defendant has the burden of proving his eligibility for a mitigating role adjustment by a preponderance of the evidence). He failed, as we will ultimately explain, but before getting to that point, we must consider what average culpability means in actual practice, where the rubber meets the road. First, the big picture.

The fountainhead of this and related drug streams was in Mexico, embodied in one, Valentin Beltran-Lopez, the leader of a Mexican drug-trafficking organization (DTO). Carlos Garcia-Duran imported multi-pound quantities of methamphetamine from the DTO into the United States and distributed them in Arizona and other states. Jose Francisco Lares-Rodriguez supplied at least some of the imported methamphetamine to Guillermo Villela, Jr., in Phoenix. Villela, who is known to be a large distributor and who also collects drug proceeds from Garcia-Duran on behalf of one of Garcia-Duran's Mexico-based sources of supply, distributed some of the drugs to Arturo Valle in Kansas City (his other distributions are not documented in the record). Villela used Moreno to transport drugs from Phoenix to Kansas City. Roberto Duran rented some of the vehicles used to transport the drugs.

---

[9] Section 3B1.2 defines "participant" as "a person who is criminally responsible for the commission of the offense, but need not have been convicted." USSG §§ 3B1.1, comment. (n.1), 3B1.2, comment. (n.1) (referring to Application Note 1 of § 3B1.1 for definition of "participant"). "We have held that a 'participant' for purposes of § 3B1.2 need not be charged with the offense of conviction to be considered as a participant under the Guidelines." *United States v. Salas*, 756 F.3d 1196, 1207 (10th Cir. 2014). Thus, it is immaterial that Moreno was the sole defendant named in the indictment.

Accentuating the obvious, this case is but a small part of an interstate and international drug distribution network, the intimate details of which, while possibly known to DEA and the Department of Justice, are not exhaustively documented in the record. However, we can reasonably infer, from known facts, that this case was a small part of a substantial, sophisticated drug distribution network involving many players—large, small, and everywhere in between. Our precedent takes note of that practical reality.

It looks not only at the thin slice of reality presented in a particular case, but also recognizes the benefits of a global perspective; it permits case peculiar facts to be considered in light of reliable inferences about other, perhaps larger and more pernicious operations. In doing so, we rely heavily on the experience of district judges who draw understanding from those factual inferences and whose judgment is informed by repeated, top to bottom, exposure to a wide range of diversely organized drug distribution chains.[10] In requiring a two-step approach—considering the facts of the case at bar and a case envisioned by a sophisticated understanding of the variety and complexity of the means and methods employed by drug lords—we primarily look to individual, case-specific acts, but refuse to ignore real world dynamics.- We now turn to the specifics of this case, concentrating on the internal comparison, as does Moreno.

Moreno refers to himself as a mere courier who had no control over the amount,

---

[10] Justice Oliver Wendell Holmes, Jr. famously said, "The life of the law has not been logic: it has been experience." Oliver Wendell Holmes, Jr., THE COMMON LAW, 1 (1881).

type, destination, or price of the drugs and he did not organize or negotiate the transaction. According to him, he did not profit from the distribution other than to receive a flat fee ($3,000) to deliver the drugs and he did not own the vehicle or rent it (conveniently ignoring that he asked Duran to rent it for him). Other than his brother, he says, his co-participants in the offense were considerably more culpable. While he admits to contact with these other individuals, he claims the contact was only necessary to his role as courier. Moreno's attempts to minimize his role fail.

Granted, he was a drug courier, but that role does not necessarily entitle him to a minor role adjustment. *See Martinez*, 512 F.3d at 1276 ("[W]e have consistently refused to adopt a per se rule allowing a downward adjustment based solely on a defendant's status as a drug courier.") (quotation marks omitted). Indeed, "drug couriers are an indispensable component of drug dealing networks" and "[t]o debate whether couriers as a group are less culpable would not be productive, akin to the old argument over which leg of a three-legged stool is the most important leg." *Id.* (quotation marks omitted). Instead, whether his role was minor depends on his culpability relative to "the average participant." The burden of proof is for him to bear. He must convince the fact-finder that he was "substantially less culpable than the average participant."[11]

---

[11] The commentary to § 3B1.2 defines "minor participant" as a defendant "who is *less culpable* than most other participants in the criminal activity, but whose role could not be described as minimal." USSG § 3B1.2, comment. (n.5) (emphasis added). However, the same commentary (different application note) provides that §3B1.2 "provides a range of adjustment for a defendant who plays a part in committing the offense that makes him *substantially less culpable* that the average participant in the

(Continued . . .)

- 14 -

For the purpose of establishing relative culpability among involved actors, Moreno identifies the following: (1) Valentin Beltran-Lopez (the king pin—the leader of the DTO), (2) Jose Carlos Garcia-Duran (importer and local and regional distributor—imported multi-pound quantities of methamphetamine from Mexico and distributed them in Arizona and throughout the country), (3) Jose Francisco Lares-Rodriguez (supplier and drug courier—supplied drugs to Guillermo Villela, Jr., in Phoenix, had ties to Mexico and the United States, and traveled at least once with Moreno to Kansas City to deliver drugs), (4) Guillermo Villela, Jr. (regional distributor—used Moreno to transport drugs to Kansas City—and money courier), (5) Arturo Valle (Kansas City distributor), (6) Jose Ramon Ceniceros-Quintero (Phoenix distributor), (7) Roberto Duran[12] (upon Moreno's request, rented the vehicle Moreno used in this case), (8) Juan Carlos Marquez (possible drug courier), and (9) Jesus Pena-Lopez (his fingerprints were found on the drugs in this case).[13]

---

criminal activity." USSG § 3B1.2, comment. (n.3(A)) (emphasis added). Therefore, for the adjustment to apply, it seems Moreno has to be "substantially less culpable than the average participant" rather than merely "less culpable than most other participants in the criminal activity." In the end, it doesn't matter. He has failed to satisfy either standard.

[12] Duran owns Duran-Duran Custom Upholstery, where Moreno worked his "day job" installing auto upholstery. Moreno's story was inconsistent as to who he contacted to rent the vehicle for his drive to Kansas City this time. He told the stopping officer Duran rented the vehicle. Later, he told the interviewing officers that his friend William, a/k/a Tapiceria, rented the vehicle for him.

[13] In identifying co-participants, Moreno looks to the larger DTO rather than the more narrow offense conduct. Does "average" suggest mathematical precision? If so, does it refer to the mean, the mode, the median, or something else? Is it just counting noses or is it a weighted test?

Conspicuously absent from his list are all the penny ante actors and bit players everyone knows to exist but are not identified in the record—for instance, Valle's distributors (street dealers and intermediate suppliers), runners, and enforcers. They may have been unknown to the government or it may have thought it unnecessary (according to our cases) to individually identify them in order to refute Moreno's claim that he was a mere drug courier entitled to the adjustment. After all, our precedent allows filling in the blanks in a disciplined manner. In any event, even comparing Moreno to his brother and those he identifies as participants, we cannot say he is less culpable than the average participant.

First, we do not view Beltran-Lopez, Garcia-Duran, Lares-Rodriguez, Villela, Valle, and Ceniceros-Quintero as "average participant(s)" or unqualified comparators. They controlled the amount, type, destination, and price of the drugs and, most probably, profited significantly from both this and other similar crimes. They are not "average participant[s]." Rather, they qualify as organizers, leaders, managers, or supervisors. The guidelines make special accommodations for such individuals. *See* USSG § 3B1.1 (calling for an upward adjustment for those playing an aggravating role). Nevertheless, we give them measured consideration in the culpability equation; they are, admittedly, more culpable than Moreno, but that does not end the debate.

We look now at those who are not leaders or supervisors. Of those specifically identified in the record, they are Duran, Moreno's brother Kevin, Marquez, and Jesus Pena-Lopez. Comparing the roles of those players to that of Moreno reveals him to be

considerably more culpable than any of them.

At Moreno's direction, Duran rented the vehicle in this case.[14] Admittedly, he rented at least four other vehicles to be used to transport drugs (the record does not reveal who directed him to do so) and was discovered driving a rental car with Marquez, who, a month later, was found traveling with drugs. At first blush, that may suggest Marquez was a courier, like Moreno. However, no drugs were found in Duran and Marquez's rental car. We also know nothing about their profit from the operation and nothing suggests they profited any more than Moreno. But other matters are equally important; unlike Moreno, nothing of record shows them having personal contact with Lares-Rodriguez, Villela, or Valle. Duran's only significant contacts appear to be with drug couriers. Nor is there any evidence that the big boys entrusted Duran or Marquez with transporting a significant amount of drugs over a long distance. Moreno was more culpable than those two.

Kevin participated with Moreno in the transportation of a significant amount of drugs in this case. He also had contact with Villela over the telephone. But again, unlike Moreno, there is no indication he had contact with Lares-Rodriguez or Valle or had made previous trips. Moreover, no evidence shows him to have had any role in securing the vehicle or taking it "somewhere" to be loaded with drugs. Kevin claimed to have no knowledge of the methamphetamine seized in this case. Moreno agrees. In his words,

---

[14] Moreno also said William, a/k/a Tapiceria rented the vehicle for him in this case. If we consider him in the calculation, he too is less culpable than Moreno as that is all we know of his participation.

"[i]t's all on me." (R. Vol. III at 7.) Suspending disbelief,[15] we take the brothers at their word regarding culpable conduct. Kevin's culpability is nowhere near that of Moreno.

That leaves Pena-Lopez. His fingerprints were found on the methamphetamine in this case. A logical inference is that he may have loaded the drugs, but that is all we know.

With respect to known participants, we are left, then, with the movers and shakers (6) and others (4) with Moreno in the middle. It is tempting simply to say, as Moreno contends, he is less culpable than an average participant and entitled to a minor role adjustment. However, a qualitative, not quantitative, approach must guide the determination. When compared to the culpability and participation of the others, Moreno is, qualitatively, closer to the big guys than the little guys; at the very least, he is an average participant. He knew the scope of the DTO and several key players, he was a trusted member of the organization (given the number of trips and the amount of drugs involved), and he was paid well for his services.[16] As at least an average participant, he cannot be "substantially less culpable than the average participant."

---

[15] Yet, in a separate investigation, officers intercepted Kevin talking with Villela over the telephone. Another anomaly invites skepticism about Kevin's unwitting participation. He told agents he was traveling with Moreno to visit Ft. Hays State University but could not explain why they continued to drive East four hours after passing the college.

[16] Moreno was paid $3,000 for this trip. Kansas City is approximately 19 hours from Phoenix. Even assuming it took him a total of five days (four days to travel there and back and one overnight stay in Kansas City), that is $600 tax-free dollars a day. Not a bad day's pay.

Although Amendment 794 does not apply, consideration of the factors outlined in it is a worthy pursuit. Doing so does not alter our conclusion. We briefly discuss them with apologies for being repetitious.

Moreno was aware of the scope and structure of the drug-trafficking activity. He knew the drugs were imported from Mexico to Arizona and then transported from Arizona to Kansas City. He knew Lares-Rodriguez (Villela's supplier), Villela (Valle's supplier), and Valle (the Kansas City buyer). Indeed, the facts show: (1) his cell phone contained a United States and a Mexican telephone number for Lares-Rodriguez; (2) in March 2013, the vehicle in which he and Lares-Rodriguez were traveling was stopped after delivering drugs to the Kansas City stash house; (3) he and Lares-Rodriguez personally met with Valle in Kansas City in April 2013; and (4) he delivered multiple loads of drugs to Valle in Kansas City for Villela. No evidence suggests Duran, Kevin, Marquez, or Pena-Lopez were similarly knowledgeable, trusted, or sophisticated.

Moreno had some planning and decision-making responsibilities. He obtained the vehicle used to transport the drugs (directing his friend/employer, Duran, to rent one for him). He also arranged the time to drop the car off to be loaded with drugs and the pick-up time. There is also some indication in the record that he may have chosen Kevin as his travel companion because he fit the description of a college student and therefore gave credence to the story he concocted concerning their travel plans.

The extent and nature of his participation in the criminal activity demonstrate his role as a trusted and valued member of the drug-trafficking organization. Villela trusted

Moreno with a significant amount of methamphetamine and trusted him to travel with three high value cargos over a long distance. Moreno knew the location of the Kansas City stash house and was a significant enough player in the organization to meet Valle in person. This was not an isolated event. It was one of three Moreno admitted.

Finally, Moreno benefitted from the criminal activity. He claims his fee was miniscule compared to the value of the seized drugs and asks that we take him at his word. That we cannot do; he did not bother to produce evidence or otherwise reveal the value to the district judge. *C.f. United States v. Salas*, 756 F.3d 1196, 1207 (10th Cir. 2014) ("A defendant's own assertion that he was a minimal participant is not enough to overcome the clearly erroneous standard."). Assuming he was paid for his previous trips, he profited not only from this crime but also from the larger criminal activity of the distribution network.

Since this is, at bottom, a qualitative evaluation, we necessarily accord much respect to the trial judge's better understanding of the circumstances and his greater experience in these matters. After all, "The life of the law has not been logic: it has been experience." Oliver Wendell Holmes, Jr., THE COMMON LAW, 1 (1881).

**AFFIRMED**.

**Entered by the Court:**


**Terrence L. O'Brien**
United States Circuit Judge

- 20 -

**§3B1.2.    Mitigating Role**

Based on the ~~defendant's~~defendant's role in the offense, decrease the offense level as follows:

(a) If the defendant was a minimal participant in any criminal activity, decrease by **4** levels.

(b) If the defendant was a minor participant in any criminal activity, decrease by **2** levels.

In cases falling between (a) and (b), decrease by **3** levels.

*Commentary*

Application Notes:

1.    Definition.—For purposes of this guideline, ~~"~~"participant~~"~~" has the meaning given that term in Application Note 1 of §3B1.1 (Aggravating Role).

2.    Requirement of Multiple Participants.—This guideline is not applicable unless more than one participant was involved in the offense. See the Introductory Commentary to this Part (Role in the Offense). Accordingly, an adjustment under this guideline may not apply to a defendant who is the only defendant convicted of an offense unless that offense involved other participants in addition to the defendant and the defendant otherwise qualifies for such an adjustment.

3.    Applicability of Adjustment.—

(A)    Substantially Less Culpable than Average Participant.—This section provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant~~.~~ in the criminal activity.

A defendant who is accountable under §1B1.3 (Relevant Conduct) only for the conduct in which the defendant personally was involved and who performs a limited function in ~~concerted~~the criminal activity ~~is not precluded from consideration for~~may receive an adjustment under this guideline. For example, a defendant who is convicted of a drug trafficking offense, whose ~~role~~participation in that offense was limited to transporting or storing drugs and who is accountable under §1B1.3 only for the quantity of drugs the defendant personally transported or stored ~~is not precluded from consideration for~~may receive an adjustment under this guideline.

Likewise, a defendant who is accountable under §1B1.3 for a loss amount under §2B1.1 (Theft, Property Destruction, and Fraud) that greatly exceeds the

~~defendant's~~defendant's personal gain from a fraud offense ~~and~~or who had limited knowledge of the scope of the scheme ~~is not precluded from consideration for~~may receive an adjustment under this guideline. For example, a defendant in a health care fraud scheme, whose ~~role~~participation in the scheme was limited to serving as a nominee owner and who received little personal gain relative to the loss amount, ~~is not precluded from consideration for~~may receive an adjustment under this guideline.

(B)   Conviction of Significantly Less Serious Offense.—If a defendant has received a lower offense level by virtue of being convicted of an offense significantly less serious than warranted by his actual criminal conduct, a reduction for a mitigating role under this section ordinarily is not warranted because such defendant is not substantially less culpable than a defendant whose only conduct involved the less serious offense. For example, if a defendant whose actual conduct involved a minimal role in the distribution of 25 grams of cocaine (an offense having a Chapter Two offense level of level 12 under §2D1.1 (Unlawful Manufacturing, Importing, Exporting, or Trafficking (Including Possession with Intent to Commit These Offenses); Attempt or Conspiracy)) is convicted of simple possession of cocaine (an offense having a Chapter Two offense level of level 6 under §2D2.1 (Unlawful Possession; Attempt or Conspiracy)), no reduction for a mitigating role is warranted because the defendant is not substantially less culpable than a defendant whose only conduct involved the simple possession of cocaine.

(C)   Fact-Based Determination.—The determination whether to apply subsection (a) or subsection (b), or an intermediate adjustment, is based on the totality of the circumstances and involves a determination that is heavily dependent upon the facts of the particular case.

In determining whether to apply subsection (a) or (b), or an intermediate adjustment, the court should consider the following non-exhaustive list of factors:

(i)     the degree to which the defendant understood the scope and structure of the criminal activity;

(ii)    the degree to which the defendant participated in planning or organizing the criminal activity;

(iii)   the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

(iv)    the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;

(v)     the degree to which the defendant stood to benefit from the criminal activity.

For example, a defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks should be considered for an adjustment under this guideline.

The fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative. Such a defendant may receive an adjustment under this guideline if he or she is substantially less culpable than the average participant in the criminal activity.

4.      Minimal Participant.—Subsection (a) applies to a defendant described in Application Note 3(A) who plays a minimal role in concertedthe criminal activity. It is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group. Under thisprovisionthis provision, the defendant'sdefendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant.

5.      Minor Participant.—Subsection (b) applies to a defendant described in Application Note 3(A) who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal.

6.      Application of Role Adjustment in Certain Drug Cases.—In a case in which the court applied §2D1.1 and the defendant'sdefendant's base offense level under that guideline was reduced by operation of the maximum base offense level in §2D1.1(a)(5), the court also shall apply the appropriate adjustment under this guideline.

Historical Note:  Effective November 1, 1987.  Amended effective November 1, 1992 (see Appendix C, amendment 456); November 1, 2001 (see Appendix C, amendment 635); November 1, 2002 (see Appendix C, amendment 640); November 1, 2009 (see Appendix C, amendment 737); November 1, 2011 (see Appendix C, amendments 749 and 755); November 1, 2014 (see Appendix C, amendment 782).); November 1, 2015 (see Appendix C, amendment 794).