**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 17, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

GLADYS NKOME,

     Defendant - Appellant.

No. 18-3261

---

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 2:17-CR-20021-DDC-2)**

---

Kayla Gassmann, Appellate Attorney (Melody Brannon, Federal Public Defender, David M. Magariel, Assistant Federal Public Defender, with her on the briefs), Office of the Federal Public Defender, Kansas City, Kansas, for Defendant-Appellant.

Jared S. Maag, Assistant United States Attorney (Stephen R. McAllister, United States Attorney, and James A. Brown, Assistant United States Attorney, with him on the brief), Office of the United States Attorney, District of Kansas, Topeka, Kansas, for Plaintiff-Appellee.

---

Before **HOLMES**, **MATHESON**, and **BACHARACH**, Circuit Judges.

---

**HOLMES**, Circuit Judge.

---

Defendant-Appellant Gladys Nkome challenges the district court's denial of a mitigating-role adjustment under United States Sentencing Guideline ("Guidelines" or "U.S.S.G.") § 3B1.2. After careful consideration of Ms. Nkome's arguments, we conclude that the district court did not err. Therefore, exercising jurisdiction under 28 U.S.C. § 1291, we **affirm**.

**I**

**A**

Prior to her arrest in May 2017, Ms. Nkome participated in an international "advance-fee" conspiracy managed by individuals located in the Republic of Cameroon. R., Vol. III, at 94, 124 (Amended Presentence Investigation Report, filed Feb. 19, 2019). The Cameroon-based organizers created websites that purportedly sold legal and illegal goods. They convinced prospective online buyers to wire purchase money to fictitious U.S.-based sellers. A U.S.-based individual posing as a seller—a so-called "money mule"—would retrieve the wired money, take a percentage, and send the remainder overseas to the conspiracy's organizers. *Id.* at 94. The buyers would never receive the items that they sought to purchase.

For approximately thirteen months, Ms. Nkome used at least thirty-five (35) fraudulent identities to collect $357,078.74 in wire transfers connected to the

2

conspiracy. *Id.* at 124. Ms. Nkome's co-defendant, Roderich Nkarakwi,[1] also engaged in money-mule activities in furtherance of the conspiracy, but his conspiratorial conduct extended beyond that role. Mr. Nkarakwi communicated with conspirators in Cameroon and directly facilitated Ms. Nkome's money-mule activity by, among other things, helping her to obtain her false identities. After each transaction, Ms. Nkome transferred seventy to eighty percent of her proceeds to the conspiracy's organizers outside the U.S. Between 2014 and 2017, Mr. Nkarakwi also regularly participated in this conspiracy. He collected at least $481,578.01 and used no fewer than ninety-five (95) different false identities. Mr. Nkarakwi also retained twenty to thirty percent of the gross proceeds from his money-mule activities and remitted the rest (i.e., seventy to eighty percent) overseas to conspirators.

**B**

In May 2017, a federal grand jury sitting in the U.S. District Court for the District of Kansas returned a six-count indictment against Ms. Nkome and Mr. Nkarakwi, charging them with conspiracy to commit wire fraud under 18 U.S.C.

---

[1] As we discuss *infra*, the district court found relevant to its analysis of Ms. Nkome's knowledge of the criminal conspiracy's scope and structure the fact that she and Mr. Nkarakwi—who undisputedly played more roles in the conspiracy than Ms. Nkome—had had a personal relationship; indeed, he was the father of her child. *See* R., Vol. II, at 119, 127.

§ 1349 (count I) and several substantive wire-fraud offenses in violation of 18 U.S.C. § 1343 (counts II through VI).

Ms. Nkome pleaded guilty in April 2018 to the indictment's conspiracy count without a written plea agreement. The U.S. Probation Office prepared a Presentence Investigation Report ("PSR")[2] that set Ms. Nkome's base offense level at seven, pursuant to U.S.S.G. § 2B1.1(a)(1). The PSR purported to take into account solely Ms. Nkome's own activities involving her "use of false identities to pick up wire transfer monies" (as opposed to basing the amount on the loss caused by the overall conspiracy) in calculating the loss amount attributable to her. R., Vol. III, at 124. It elevated her adjusted offense level by twelve, pursuant to U.S.S.G. § 2B1.1(b)(1)(G), based on a loss amount of between $250,000 and $550,000. After making additional offense-level adjustments, not relevant here, the PSR set her total adjustment offense level at twenty. With a criminal history category of I, the PSR set Ms. Nkome's advisory Guidelines sentencing range at thirty-three to forty-one months' imprisonment.

Ms. Nkome objected to certain aspects of the PSR and subsequently filed a sentencing memorandum to support her position. As relevant here, Ms. Nkome contended that the Probation Office should have recommended her for a

---

[2] The Probation Office relied on the 2016 edition of the Guidelines in preparing the PSR. Because this decision has not been challenged on appeal, we also rely on that edition in resolving the sentencing issues in this appeal.

mitigating-role adjustment pursuant to U.S.S.G. § 3B1.2[3] and argued that the loss

amount that the office attributed to her was unreasonable.  More specifically, as

to the mitigating-role adjustment, Ms. Nkome contended she should have received

the adjustment because she was merely "a 'money mule' and her role was limited

to picking up money at certain locations and sending the majority of the funds on

to others."  R., Vol. III, at 169.  Ms. Nkome perceived the various participants in

the conspiracy as falling into tiers of culpability—with the "Leader organizer" at

the top and the "Money mule" at the bottom.  *Id.* at 169–70.  And, when her

limited role was considered in a totality-of-the-circumstances analysis, Ms.

Nkome reasoned that the PSR should have recommended her for a mitigating-role

adjustment.  *See id.* at 169–70.  The Probation Office, however, disagreed.  It

reasoned that, "though comparisons of Ms. Nkome to people who performed other

roles [in the conspiracy] may be helpful in distinguishing duties, the comparisons

do not demonstrate that [Ms. Nkome] was *substantially less culpable than the*

*average participant*," which is a necessary showing for a mitigating-role

---

[3]     Briefly stated, the Guidelines authorize a four-level reduction for a
defendant who was "a minimal participant in any criminal activity," a two-level
reduction for a defendant who was "a minor participant" in the criminal activity,
and a three-level reduction for a defendant whose participation in the criminal
activity was of an "intermediate" level—between "minimal" and "minor."
U.S.S.G. § 3B1.2 & cmt. n.3(C).

adjustment. *Id.* at 172. The Probation Office found that, in terms of culpability, Ms. Nkome was "an average participant." *Id.*

## C

The district court conducted a sentencing hearing. There, the court heard testimony from the law-enforcement case agent concerning the nature of the fraudulent conspiracy and Ms. Nkome's role in it, and then heard arguments from the parties. Partway through the hearing the parties reached an agreement concerning the loss amount, stipulating that the loss was "more than [$]95,000 but less than [$]150,000." R., Vol. II, at 89. However, Ms. Nkome maintained her objection regarding the mitigating-role adjustment.

Based on its consideration of the testimonial evidence, the PSR's findings, and the parties' arguments, the district court determined Ms. Nkome did not qualify for a U.S.S.G. § 3B1.2 reduction. *Id*. at 126–30. It reached this decision in part by applying five non-exhaustive factors set out in Note 3(C) of the Guidelines commentary. Briefly stated, these factors inquire into the extent to which the defendant: (1) understood the scope and structure of the criminal activity; (2) planned or organized the criminal activity; (3) exercised decision-making authority regarding the activity; (4) participated in the criminal activity and possessed discretion and responsibility concerning it; and (5) stood to benefit from the criminal activity. *See* U.S.S.G. § 3B1.2, cmt. n.3(C).

The district court reasoned that, under the view of the record "most favorable" to Ms. Nkome, the first factor would be no more than "neutral," but the court ultimately found that "the evidence [made] it more likely than not that [Ms. Nkome] understood how [the] conspiracy worked and . . . [her role] in it." R., Vol. II, at 126–27. In this regard, the court noted "particularly given [Ms. Nkome's] long run participation in [the conspiracy], her connection to her co-defendant [i.e., Mr. Nkarakwi] who played more positions in the conspiracy than she did, I think it is more likely on balance than not that she understood well how this conspiracy worked." *Id.* at 127. Next, the court found that factors two and three supported Ms. Nkome's position because the evidence did not establish that she either planned the activity or exercised authority over those who did. *Id.* at 127–28 (observing that, based on the parties' arguments, it is "not persuasive to believe that she played a significant organizing or planning role or that she exercised authority or influenced those who did").

As for the fourth factor, the court found that "this is the factor on which [Ms. Nkome] does the worst" because "[s]he was a meaningful[,] repeating[,] persistent participator." *Id.* at 128. The court clarified that it was "not particularly persuaded by arguments that say [Ms. Nkome] played an integral role because most of these transactions or conspiracies need everyone in every role. So the fact that the money wouldn't have gotten claimed without her is not

7

particularly meaningful[.]" *Id.* However, the court said that upon "look[ing] at the nature and extent of [Ms. Nkome's] participation in this activity spread over a substantial period of time going in . . . to claim money by herself, it seems . . . that she does have a significant role in [the conspiracy] whether it is integral or not." *Id.*

Finally, the court found that the fifth, and last factor, did "not favor [Ms. Nkome]." *Id.* at 129. More specifically, concerning the extent to which Ms. Nkome stood to benefit from the criminal activity, the court reasoned as follows:

> Like many things that happen in conspiracies and criminal activity generally, the exact amount of loss that Ms. Nkome imposed upon members of the public is not clear. The parties agree that it's somewhere between 95- and 150,000 dollars, and also appear to agree she profited in the range of 20 to 30 percent of that gross theft or gross loss. At the 20 percent at the low end of that, her takeaway was $19,000. At the 30 percent on the high end her takeaway was $45,000. That's a significant benefit and it is a benefit that is -- that is a piece of the action. The more of it she did, the better she did. And so this factor in my judgment, based on the evidence pertaining to it given the long running and persistent nature of it and the degree of the benefit that we know she derived, does not favor [Ms. Nkome].

*Id.* at 128–29.

In reaching its ultimate conclusion regarding the inapplicability of the adjustment, the court observed that the Guidelines did not oblige it to mechanically add up the five factors; the adjustment determination was "not a scoreboard kind of thing." *Id.* at 129. Rather, said the court, the Guidelines

8

intend for the court to ground its determination on "the totality of the circumstances." *Id.* And though the court acknowledged that only "three of the factors disfavor the defendant" and that "the first factor [made for] a little closer call" than the other two against the defendant, it ultimately found that Ms. Nkome had not established that she qualified for a mitigating-role adjustment. *Id.*

The court reasoned as follows:

> The exact structure of this from the evidence I heard and the undisputed facts in the presentence report aren't altogether clear, but it seems that this was a conspiracy in an organization that had relatively sophisticated people at the top of it and then a bunch of piece workers, people who may have applied more sophisticated skills like building a website or creating falsified documents or going in to claim the money, *but that does not make them any less culpable than the defendant's culpability here*.
>
> So while I'm -- it's a relatively close question on whether she deserves a minor two-level reduction, I do not find it close on whether she deserves a reduction at the minimal level or intermediate. And given the defendant bears the burden on this, I'm overruling the objection.

*Id.* at 129–30 (emphasis added). When Ms. Nkome's counsel inquired whether the court had intended by its remarks to deny all mitigating-role adjustments—including the lowest (i.e., two-level) downward adjustment—the court shed further light on its reasoning:

> I think at the two-level it is a relatively close question. But when I look at the key concept that is expressed in that [Guidelines] commentary section that says is the defendant substantially less

9

culpable than the average participant in this criminal activity [i.e., Note 3(C)], to me and the way -- on the totality of the circumstances the way I evaluate this conspiracy is there was someone more culpable than Ms. Nkome at the top but then there were a bunch of people of relatively equal culpability. And I cannot say with that view of the conspiracy that [Ms. Nkome] is substantially less culpable than the average participant, and so that's why I overruled the objection.

*Id.* at 131–32.

After applying all of the Guidelines adjustments, the court found that Ms. Nkome's "total offense level [wa]s down from what the presentence report found to 16 with a criminal history of one," which "produce[d] a guideline range of 21 to 27 months." *Id.* at 142. Having then considered the sentencing factors of 18 U.S.C. § 3553(a), the court sentenced Ms. Nkome to the bottom of that range—that is, to twenty-one months' imprisonment.

Ms. Nkome has timely appealed, arguing that the court erred in denying her request for a mitigating-role reduction pursuant to U.S.S.G. § 3B1.2.

**II**

**A**

"[W]e review sentences for reasonableness under a deferential abuse-of-discretion standard." *United States v. Alapizco-Valenzuela*, 546 F.3d 1208, 1214 (10th Cir. 2008); *accord United States v. Cookson*, 922 F.3d 1079, 1090 (10th Cir. 2019). "Reasonableness includes both procedural and substantive components." *United States v. Masek*, 588 F.3d 1283, 1290 (10th Cir. 2009).

10

"The procedural component concerns how the district court calculated and explained the sentence, whereas the substantive component concerns whether the length of the sentence is reasonable in light of the statutory factors under 18 U.S.C. § 3553(a)." *United States v. Adams*, 751 F.3d 1175, 1181 (10th Cir. 2014).

Ms. Nkome's challenges implicate the procedural reasonableness of her sentence because, at bottom, she alleges that the district court committed legal and factual error in calculating her Guidelines sentence—more specifically, that the court's denial of her mitigating-role adjustment rested on legal error and inadequate factual evidence. Though the overarching standard for our review of the procedural reasonableness of the court's sentence is abuse of discretion, "[t]his standard is not monolithic." *United States v. Arias-Mercedes*, 901 F.3d 1, 5 (1st Cir. 2018). "[W]e review de novo the district court's legal conclusions regarding the guidelines and review its factual findings for clear error." *United States v. Gantt*, 679 F.3d 1240, 1246 (10th Cir. 2012); *accord United States v. Sanchez-Leon*, 764 F.3d 1248, 1262 (10th Cir. 2014).

The court's denial of a mitigating-role adjustment is a factual determination and, accordingly, we review it for clear error. *See United States v. Delgado-Lopez*, 974 F.3d 1188, 1191 (10th Cir. 2020); *United States v. Martinez*, 512 F.3d 1268, 1275 (10th Cir. 2008); *see also* U.S.S.G. § 3B1.2, cmt. n.3(C) (noting that

11

whether to apply a mitigating-role adjustment is "a determination that is heavily dependent upon the facts of the particular case"). But, we recognize that "[a] district court commits legal error when it applies the 'wrong test' in making a factual finding at sentencing." *Delgado-Lopez*, 974 F.3d at 1194 (quoting *United States v. Yurek*, 925 F.3d 423, 446 (10th Cir. 2019)). And "[a]n error of law is per se an abuse of discretion." *United States v. Lopez-Avila*, 665 F.3d 1216, 1219 (10th Cir. 2011); *accord United States v. Clark*, 981 F.3d 1154, 1162 (10th Cir. 2020).

"The defendant bears the burden of proving by a preponderance of the evidence whether an adjustment under § 3B1.2 is warranted." *United States v. Salas*, 756 F.3d 1196, 1207 (10th Cir. 2014); *see United States v. Ayers*, 84 F.3d 382, 383 (10th Cir. 1996) ("[I]t is the defendant's burden to establish by a preponderance of the evidence that he or she is entitled to an offense reduction."). Before considering Ms. Nkome's specific arguments, we examine the relevant Guidelines provisions.

**B**

The Guidelines instruct district courts to decrease by four levels a defendant's offense level when "the defendant was a minimal participant in any criminal activity," U.S.S.G. § 3B1.2(a), by two levels when "the defendant was a minor participant," *id.* § 3B1.2(b), and by three levels when the defendant's

12

participation in the criminal activity was of an "intermediate" level—between "minimal" and "minor," *id.* § 3B1.2 & cmt. n.3(C).

The Guidelines commentary plays a significant role in elaborating on the adjustment's meaning. "Commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *United States v. Boyd*, 721 F.3d 1259, 1261 (10th Cir. 2013) (quoting *United States v. Nacchio*, 573 F.3d 1062, 1066–67 (10th Cir. 2009)); *see also Stinson v. United States*, 508 U.S. 36, 45 (1993) (explaining that if an application note's interpretation of the Guidelines does not violate the Constitution or a federal statute, we must give it "controlling weight unless it is plainly erroneous or inconsistent with the regulation." (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945))).

The applicable commentary note defines a "participant" as "a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1, cmt. n.1 (defining "participant" as to the aggravating-role adjustment); *see id.* § 3B1.2, cmt. n.1 (noting that, for purposes of § 3B1.2, "participant" "has the meaning given that term" in § 3B1.1, the aggravating-role adjustment); *accord United States v. Lacey*, 86 F.3d 956, 968 (10th Cir. 1996). Notably, the commentary further clarifies that "[t]he

13

determination of the defendant's role in the offense is to be made on the basis of all conduct within the scope of [U.S.S.G.] § 1B1.3 (Relevant Conduct) . . . and not solely on the basis of elements and acts cited in the count of conviction." U.S.S.G., Ch. 3, Pt.B, intro. cmt.; *accord United States v. VanMeter*, 278 F.3d 1156, 1166 (10th Cir. 2002); *see United States v. Harris*, 148 F. App'x 690, 693–94 (10th Cir. 2005) (unpublished) ("Once a defendant's relevant conduct for sentencing purposes is determined, the same relevant conduct is used not only in determining the defendant's base offense level but also for any role in the offense adjustments.").

Accordingly, where a defendant's criminal conduct involved a "jointly undertaken criminal activity"—such as a conspiracy, as here—a sentencing court's assessment of a defendant's role in the offense may involve in certain instances consideration of the conduct of uncharged coconspirators, as well as the conduct of charged, codefendant conspirators. U.S.S.G. § 1B1.3(a)(1)(B) & cmt. (3)(A); *see United States v. Roach*, 978 F.2d 573, 576 (10th Cir. 1992) (upholding district court's finding that unindicted conspirator was a participant for purposes of an aggravating role enhancement); *see also United States v. Garrison*, 133 F.3d 831, 844 n.22, 846 (11th Cir. 1998); *cf. Lacey*, 86 F.3d at 968 (ruling that "even though a jury did not find [defendant's two coconspirators] guilty beyond a reasonable doubt, the district court was not foreclosed from finding by a

14

preponderance of the evidence that they were 'criminally responsible' and thus participants in [defendant's] drug conspiracy"). As particularly relevant to the questions before us, the commentary makes clear that § 3B1.2 "provides a range of adjustments for a defendant who plays a part in committing the offense that makes him *substantially less culpable* than the average participant in the criminal activity." U.S.S.G. § 3B1.2, cmt. n.3(A) (emphasis added). The commentary further clarifies the meaning of the key terms. A minimal participant is a "defendant[] who [is] plainly among the least culpable of those involved in the conduct of a group." *Id.*, cmt. n.4. A "defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as a minimal participant." *Id.* A minor participant is a defendant "who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal." *Id.*, cmt. n.5.

And, as noted, a downward adjustment also is authorized for a defendant whose culpability is of an "intermediate" level—falling somewhere between the culpability of the minimal and minor participant. *Id.*, cmt. n.3(C) & n.5. "The determination whether to apply [a minimal-role adjustment, a minor-role adjustment], or an intermediate adjustment, is based on the totality of the circumstances and involves a determination that is heavily dependent upon the facts of the particular case." *Id.*, cmt. n.3(C).

15

Significantly, on November 1, 2015, the Sentencing Commission promulgated Amendment 794. U.S.S.G. Supp. to App. C., Amend. 794 (Nov. 1, 2015). The amendment effectively revised the commentary to specify that courts are to determine whether a defendant is eligible for a § 3B1.2 reduction by comparing the defendant with other participants in the same criminal activity. The Commission indicated that this revision was in response to "a circuit conflict and other case law that may be discouraging courts from applying the adjustment in otherwise appropriate circumstances." *Id.* According to the Commission, this split stemmed from differences concerning how to determine an "average participant." *Id.*

Some circuits "concluded that the 'average participant' means only those persons who actually participated in the criminal activity at issue in the defendant's case, so that the defendant's relative culpability is determined only by reference to his or her co-participants in the case at hand." *Id.* But others "concluded that the 'average participant' also includes the 'universe of persons participating in similar crimes.'" *Id.* (quoting *United States v. Santos*, 357 F.3d 136, 142 (1st Cir. 2004)). "Under this latter approach, courts will ordinarily consider the defendant's culpability relative both to his co-participants and to the

typical offender." *Id.* The Commission adopted the former view,[4] "revising the

commentary to specify that, when determining [the applicability of a] mitigating-

role adjustment, the defendant is to be compared with other participants 'in the

criminal activity'"—that is, those involved in the same criminal activity at issue

in the defendant's case. *Id.*

Amendment 794 also "provide[d] a non-exhaustive list of factors for the

court to consider in determining whether to apply a mitigating-role adjustment

and, if so, the amount of the adjustment." *Id.* In explaining the rationale for this

revision, the Commission explained that it "was persuaded by public comment

and a detailed review of cases involving low-level offenders, particularly in fraud

cases, that providing a list of factors will give the courts a common framework

for determining whether to apply a mitigating-role adjustment . . . and will help

promote consistency." *Id.*

---

[4] In our persuasive unpublished decision in *United States v. Moreno*, 696 F. App'x 886 (10th Cir. 2017) (unpublished)—though we ultimately applied the 2014, pre-amendment Guidelines—we discussed at some length the import of Amendment 794. *See id.* at 889–90. Specifically, we observed that, prior to the amendment, our cases had determined that "both comparators were relevant"—that is, both criminal participants in the specific criminal activity at issue and typical participants involved in the same type of criminal activity. *Id.* As the panel noted there, "the Sentencing Commission amended the commentary (Amendment 794) to specify only an internal comparison is permitted," that is to say a comparison of participants involved in the same criminal activity. *Id.* at 889.

Along with its introductory commentary, this list—as it appears in the Guidelines—states as follows:

> In determining whether to apply subsection (a) [i.e., minimal-participant] or (b) [i.e., minor-participant], or an intermediate adjustment, the court should consider the following non-exhaustive list of factors:
>
> (i)     the degree to which the defendant understood the scope and structure of the criminal activity;
>
> (ii)    the degree to which the defendant participated in planning or organizing the criminal activity;
>
> (iii)   the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;
>
> (iv)    the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;
>
> (v)     the degree to which the defendant stood to benefit from the criminal activity.

U.S.S.G. § 3B1.2, cmt. n.3(C).

And, relevant for our purposes, another product of Amendment 794 was two clarifying comments that the Commission placed immediately after the list. The first provides as follows: "For example, a defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks should be considered for an adjustment under this guideline." *Id.* And the second clarifies how much significance should attach to

18

the fact that a defendant played a key role in the criminal activity: "The fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative. Such a defendant may receive an adjustment under this guideline if he or she is substantially less culpable than the average participant in the criminal activity." *Id.*

Against this backdrop, we turn to assay Ms. Nkome's arguments.

### III

Ms. Nkome makes two arguments challenging the district court's denial of her request for a mitigating-role adjustment under U.S.S.G. § 3B1.2. First, she contends that, in assessing whether she qualified for the mitigating-role adjustment, the court committed legal error. Specifically, she asserts the following: "Instead of analyzing Ms. Nkome's role compared to the other participants in the criminal activity, the district court looked at the commentary factors in isolation. In doing so, it looked at Ms. Nkome's culpability, but did not compare her culpability to others in the conspiracy." Aplt.'s Opening Br. at 11; *see also* Aplt.'s Reply Br. at 5 ("Discussing Ms. Nkome's conduct under each [commentary] factor, isolated from any comparison to other participants, does not satisfy the district court's obligation to compare Ms. Nkome's role and culpability to the other participants.").

And, second, Ms. Nkome contends that the district court committed clear error in making the factual determination that she did not qualify for a mitigating-role adjustment. In particular, Ms. Nkome asserts that the court "incorrectly found that Ms. Nkome fell within an amorphous middle group" of criminal participants of comparably equal culpability. Aplt.'s Opening Br. at 11. Ms. Nkome contends that, at bottom, she was no more than "a minor participant in a vast conspiracy that spanned multiple continents and involved scores of individuals more culpable than her." *Id.*

We carefully consider Ms. Nkome's two arguments below but find them wanting: she has not adequately shouldered her burden of demonstrating that the district court erred in denying her request for a mitigating-role adjustment.

**A**

Ms. Nkome contends that the district court's mode of analysis in determining whether she qualified for a mitigating-role adjustment was legally erroneous. She argues that, "[i]nstead of conducting a comparison using the non-exhaustive list of factors contained in the commentary as a guide"—that is, a comparison between her culpability and the culpability of the other participants in

the criminal activity at issue—the district court assessed "Ms. Nkome's role in isolation." *Id.* at 17. [5]

_____

[5]    One might make a cogent argument that Ms. Nkome forfeited this legal challenge before the district court and therefore—instead of reviewing this legal question de novo (under the overarching abuse-of-discretion standard)—we should review it only for plain error. *See Yurek*, 925 F.3d at 444–45; *see also United States v. Romero*, 491 F.3d 1173, 1177 (10th Cir. 2007) (noting that "the requirement of contemporaneous objection to procedural errors is consistent with our precedent and represents a reasonable burden on defendants"); *United States v. Gantt*, 679 F.3d 1240, 1247 (10th Cir. 2012). It is true that Ms. Nkome vigorously objected to the PSR's recommended denial of the § 3B1.2 mitigating-role adjustment, and, in this regard, she also filed a sentencing memorandum advancing this challenge. Later, Ms. Nkome orally urged the district court to apply this downward adjustment at her sentencing hearing. However, like the legal challenge of the defendant in *Yurek*, Ms. Nkome's legal challenge is "alleging an error in the district court's explanation, not in the content of the presentence report. So objecting to the presentence report would not have alerted the district court to an error in its explanation." 925 F.3d at 444. And, after the district court offered its explanation for denying a mitigating-role adjustment to Ms. Nkome and announced its sentence, Ms. Nkome did not specifically object on the ground that the court's explanation—*viz.*, its comparative analysis—was legally deficient. Instead, in response to the district court's call for "any final objections," Ms. Nkome merely asserted, "I'll object to the procedural . . . reasonableness of the sentence and just sort of incorporate my comments from earlier." R., Vol. II, at 145. This general, enigmatic assertion was likely incapable of alerting the district court to the legal error Ms. Nkome asserts now. In this regard, her earlier comments at the sentencing hearing that Ms. Nkome references in the quoted passage could not possibly have alerted the district court to any purported deficiencies in its explanation because the court had yet to offer it. However, we will not definitively opine on whether Ms. Nkome forfeited her legal challenge or pursue the matter further because, even if she did forfeit the challenge, the government did not bring Ms. Nkome's possible forfeiture to our attention and thereby "forfeited the right to object" to her forfeiture. *United States v. McGehee*, 672 F.3d 860, 873 n.5 (10th Cir. 2012); *see United States v. Rodebaugh*, 798 F.3d 1281, 1306 (10th Cir. 2015) (Bacharach, J., joined by Moritz, J., writing for the court in dissent) (discussing the concept of the

(continued...)

As a general matter, it cannot be gainsaid that, in assessing a defendant's fitness for a § 3B1.2 adjustment, the sentencing court "must focus on whether the defendant 'is substantially less culpable than the average participant in the criminal activity.'" *Yurek*, 925 F.3d at 445 (quoting U.S.S.G. § 3B1.2, cmt. n.3(C)). Indeed, as we noted in *Yurek*, "[t]he crux of § 3B1.2 is a defendant's relative culpability." *Id.* at 446. Moreover, as a consequence of Amendment 794, it is clear that the Sentencing Commission has provided courts in the commentary with a "framework" of five non-exhaustive factors to employ in conducting this comparative analysis. U.S.S.G. Supp. to App. C., Amend. 794. More specifically, the commentary indicates that sentencing courts "should consider" these factors in this analysis. U.S.S.G. § 3B1.2, cmt. n.3(C).

However, as we have noted in the § 3B1.2 context, "[w]e do not require a district court 'to make detailed findings, or explain why a particular adjustment [under the guidelines] is or is not appropriate.'" *United States v. Bowen*, 437 F.3d 1009, 1019 (10th Cir. 2006) (quoting *United States v. Maldonado–Campos*, 920 F.2d 714, 718 (10th Cir. 1990)); *see also United States v. Herriman*, 739 F.3d

---

[5](...continued)
government's "waiver or forfeiture of the waiver" and collecting cases). With the matter in this posture, we exercise our discretion to "overlook" any potential forfeiture by Ms. Nkome of her legal challenge, *McGee*, 672 F.3d at 873 n.5, and review it de novo.

22

1250, 1262 (10th Cir. 2014) (observing that this *Bowen* principle is "well-established").  It is only "when it is apparent from the court's optional discussion that its factual finding may be based upon an incorrect legal standard" that we are obliged to "remand for reconsideration in light of the correct legal standard." *Bowen*, 437 F.3d at 1019 (quoting *Maldonado-Campos*, 920 F.2d at 718); *accord Delgado-Lopez*, 974 F.3d at 1193.  Moreover, in reviewing a sentencing court's pronouncements, "[w]e 'traditionally presume, absent some indication in the record suggesting otherwise, that trial judges . . . know the law and apply it in making their decisions.'"  *United States v. Chavez-Meza*, 854 F.3d 655, 659 (10th Cir. 2017) (quoting *United States v. Ruiz-Terrazas*, 477 F.3d 1196, 1201 (10th Cir. 2007), *affirmed on other grounds*, 138 S. Ct. 1959 (2018)); *accord United States v. Vann*, 776 F.3d 746, 756 (10th Cir. 2015).

Having carefully reviewed the record, we cannot agree with Ms. Nkome's contention that the district court only considered her role "in isolation," Aplt.'s Opening Br. at 17, and did not compare her culpability to other participants' culpability in her criminal scheme.  For example, recall that in considering the first of the five non-exhaustive factors of the Guidelines commentary, the court compared Ms. Nkome's participation in the criminal conspiracy to her codefendant, Mr. Nkarakwi, and was able to draw inferences in part from this comparison regarding Ms. Nkome's knowledge of the structure and scope of the

23

scheme. More specifically, the court put it this way: "[P]articularly given [Ms. Nkome's] long run participation in [the conspiracy], [and] her connection to her co-defendant [i.e., Mr. Nkarakwi] who played more positions in the conspiracy than she did, I think it is more likely on balance than not that she understood well how this conspiracy worked." R., Vol. II, at 127.

Moreover, in considering the fifth non-exhaustive factor—which calls for an inquiry into the extent to which the defendant benefitted from the criminal scheme—the court observed that the parties "appear to agree [Ms. Nkome] profited in the range of 20 to 30 percent of that gross theft or gross loss. . . . That's a significant benefit[,] . . . that is a piece of the action." *Id.* at 129. It seems quite logical to us that, in assessing Ms. Nkome's "piece of the action," as a measure of her culpability and eligibility for a mitigating-role adjustment, the court necessarily was simultaneously—albeit tacitly—comparing Ms. Nkome's culpability to that of other participants in the criminal scheme who got a larger share of the action. And, though we will discuss them in somewhat greater detail *infra*, the court's concluding comments in denying the adjustment leave us with no doubt that the court's attention was centered on comparing Ms. Nkome's criminal culpability with other participants in a criminal conspiracy populated by some "relatively sophisticated people at the top . . . and then a bunch of piece workers." *Id.* at 130. The court stated in closing: "I cannot say with that view of

24

the conspiracy that [Ms. Nkome] is substantially less culpable than the average participant." *Id.* at 132.

Admittedly, the court's on-the-record culpability comparisons were not extensive. But they did not have to be. *See, e.g.*, *Bowen*, 437 F.3d at 1019. The court did make *some* comparisons between Ms. Nkome's culpable role and that of other participants in the conspiracy. As such, it cannot be said that the court completely failed to conform its (optional) analysis to the Guidelines' comparison mandate. In other words, if the court committed legal error, it did not do so patently. *Cf. Yurek*, 925 F.3d at 446 ("By failing to consider Mrs. Yurek's relative culpability, the district court applied the wrong test when denying a mitigating-role adjustment. As the government admits, the district court's application of the wrong test constitutes an error that was plain.").

Consequently, Ms. Nkome is obligated to clearly identify in what way the court's analysis was legally deficient—*viz.*, to tell us what more the court needed to do to avoid legal error. Ms. Nkome, however, has struggled—and ultimately failed—to do this. Notably, though her opening brief organizes its discussion of the supposed legal deficiencies of the court's comparative analysis under headings with respect to the five non-exhaustive factors of the Guidelines commentary, Ms. Nkome repeatedly said in oral argument that she was *not* asserting that the district court was legally required to expressly conduct a comparative culpability analysis

25

with reference to each of the five factors. *See* Aplt.'s Reply Br. at 7 ("Our point is not that the district court individually erred on each factor, but that the district court conducted the wrong overall analysis by failing to compare Ms. Nkome's culpability to other participants in the offense.").[6]

Nonetheless, in seeking to illuminate the supposed legal deficiency of the court's comparative analysis, Ms. Nkome points to our decision in *Yurek* and the Seventh Circuit's decision in *United States v. Hill*, 563 F.3d 572 (7th Cir. 2009). Yet neither case avails her. *Yurek* did address a circumstance where the district court committed legal error—that is, it "applied the wrong test when denying a mitigating-role adjustment." 925 F.3d at 446. However, the legal error there consisted of a clear violation of the Guidelines directive concerning what legal significance courts should attach to a defendant's "essential or indispensable role in the criminal activity." U.S.S.G. § 3B1.2, cmt. n.3(C); *see Yurek*, 925 F.3d at 446. As we have noted *supra*, the Guidelines commentary provides the following:

---

[6]     Taking into account *Bowen*'s instruction that courts ordinarily are not required to offer detailed findings when denying Guidelines adjustments, Ms. Nkome's disclaimer in this regard is likely wise. *See Bowen*, 437 F.3d at 1019; *see also United States v. Diaz*, 884 F.3d 911, 916 (9th Cir. 2018) ("[The defendant] argues that the district court erred because it did not consider or mention the five factors listed in § 3B1.2, cmt. n.3(C), and failed to mention other factors it did consider when it concluded that [the defendant] did not qualify for a minor-role adjustment. But the district court was not obligated to tick off the factors on the record to show that it considered them . . . ."); *accord United States v. Daneshvar*, 925 F.3d 766, 790 (6th Cir. 2019).

26

"The fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative.  Such a defendant may receive an adjustment under this guideline if he or she is substantially less culpable than the average participant in the criminal activity."  U.S.S.G. § 3B1.2, cmt. n.3(C).

Nevertheless, the district court in *Yurek* assigned "determinative" effect in denying a mitigating-role adjustment to its factual finding that the defendant's role in the criminal activity "had been essential," and we consequently held that this was legal error.  925 F.3d at 446.  We are hard pressed to see how *Yurek*'s holding illustrates the nature of the district court's alleged legal failing here.  In finding fault with the district court's comparative culpability analysis, Ms. Nkome does not even hint that she alleges the same or similar legal error to the one that we identified in *Yurek*.  Indeed, she would not have gotten out of the starting blocks if she had attempted to do so, because the district court here expressly noted that it was "not particularly persuaded by arguments that say [Ms. Nkome] played an integral role" in the conspiracy.  R., Vol. II, at 128.  And, though she forcefully reminds us of *Yurek*'s observation that "[t]he crux of § 3B1.2 is a defendant's relative culpability," *Yurek*, 925 F.3d at 446, this general statement—important as it is—tells us nothing about the specific way in which the district court supposedly committed legal error in assessing Ms. Nkome's relative culpability.  Therefore, *Yurek* does not avail Ms. Nkome.

27

Neither does *Hill*.  Contrary to Ms. Nkome's assertion, the district court's analysis here does not present an analogous concern to the one that the Seventh Circuit confronted in *Hill*.  There, though the district court had made "a factual determination normally entitled to deferential review," in denying the defendant a mitigating-role adjustment, the Seventh Circuit nevertheless remanded the matter for reconsideration, stating that it "cannot be confident that [the court's] analysis was guided by the appropriate factors."  *Hill*, 563 F.3d at 579.  More specifically, the Seventh Circuit lacked confidence in the court's factual analysis because the defendant there had successfully demonstrated that the court's analytical approach was infected with legal error.  Specifically, the defendant had shown that "the [sentencing] court's approach . . . reflect[ed] an inclination to divorce the offense of conviction from the surrounding facts," and the Seventh Circuit had concluded that this tendency had led the court to erroneously disregard relevant conduct, as the Guidelines define it (i.e., U.S.S.G. § 1B1.3), in concluding that the defendant was legally ineligible for a mitigating-role adjustment.  *Id.* at 578–79.

*Hill*, however, does not aid Ms. Nkome.  Unlike the *Hill* defendant, Ms. Nkome has not clearly identified a purported legal error in the district court's comparative analysis—let alone successfully established that error.  Thus, Ms. Nkome has given us no reason to lack confidence that the district court's analysis here was guided by the appropriate legal considerations.  Stated otherwise, unlike

28

the Seventh Circuit in *Hill*, we have no reason to lack confidence that the district court understood the Guidelines directive to compare the defendant's role to other participants in the criminal activity.

All of this is not to say that—in the portion of her briefing devoted to the district court's ostensible legal error—Ms. Nkome does not spill ink making arguments. But, in essence, Ms. Nkome's arguments are misguided or inapposite. She objects to the lack of detail in the district court's comparative analysis, but, at least on this record, this argument (for reasons outlined *supra*) is a non-starter under *Bowen* and its progeny. *See Bowen*, 437 F.3d at 1019.

In substance, Ms. Nkome primarily complains about how the district court exercised its judgment in identifying criminal participants with whom to compare Ms. Nkome's culpability and about the results of such (as she sees it) flawed comparisons. *See, e.g.*, Aplt.'s Opening Br. at 17–18 (objecting that, after the district court compared Ms. Nkome's culpable conduct to Mr. Nkarakwi's in assaying her knowledge of the scope and structure of the criminal scheme, the court failed to take the "necessary step of comparing that knowledge to other participants," like "the regional organizers and the document forgers"); *see also* Aplt.'s Reply Br. at 6–7 (objecting to the district court's alleged failure to "compare her participation to that of the international or regional organizers, who had participated for a much longer period of time, across multiple countries, who

29

performed more and more important tasks, were involved with more victims and participants"). But such arguments implicate the sufficiency of the court's factual—not legal—analysis. *See Arias-Mercedes*, 901 F.3d at 7–8 (in discussing the court's factual analysis, subject to the clear-error standard, noting that "a district court must still exercise judgment to identify the universe of participants involved in the particular conduct that forms the basis of the defendant's sentence" and must subsequently decide where a defendant and her "cohorts can be located on a continuum" of culpability). As such, Ms. Nkome does not get the benefit of the more-rigorous de novo review. We review such arguments only under the deferential clear-error standard. *See, e.g.*, *Delgado-Lopez*, 974 F.3d at 1191; *Martinez*, 512 F.3d at 1275. And we address her factual challenge *infra*.

In sum, on this record where the district court did make *some* comparisons between Ms. Nkome's culpable role and that of other participants in the conspiracy comprising her offense conduct, and Ms. Nkome has not clearly pinpointed the source of any legal error in the court's analysis, we must presume that the court fully understood the legal boundaries attending its comparative analysis and did not trespass them. *See Chavez-Meza*, 854 F.3d at 659 (noting the traditional presumption that sentencing courts know the law and follow it).

**B**

We now turn to Ms. Nkome's second challenge. She alleges that the district court erred in finding her ineligible for a mitigating-role adjustment. As noted, we use the clear-error standard in reviewing this type of challenge. *See, e.g.*, *United States v. Llantada*, 815 F.3d 679, 685 (10th Cir. 2016). Under this deferential standard, "[i]f the 'court's account of the evidence is plausible in light of the record viewed in its entirety,' we may not reverse it even if we might have weighed the evidence differently." *United States v. Piper*, 839 F.3d 1261, 1271 (10th Cir. 2016) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985)); *see United States v. Torres*, 53 F.3d 1129, 1140 (10th Cir. 1995) ("To constitute clear error, we must be convinced that the sentencing court's finding is simply not plausible or permissible in light of the entire record on appeal, remembering that we are not free to substitute our judgment for that of the district judge." (citing *Anderson*, 470 U.S. at 573)). It is fair to say that, under the clear-error standard, "battles over a defendant's status and over the scope of the criminal enterprise will almost always be won or lost in the district court." *United States v. Graciani*, 61 F.3d 70, 75 (1st Cir. 1995).

Recall that to qualify for a mitigating-role adjustment, a defendant has the burden of establishing by a preponderance of the evidence that she was "substantially less culpable than the average participant." *United States v.*

31

*Salazar-Samaniega*, 361 F.3d 1271, 1277 (10th Cir. 2004) (quoting U.S.S.G. § 3B1.2, cmt. n.3(A)). This is a requirement of considerable consequence. In this regard, "[w]e have [ ] held that a defendant is not entitled to a reduction under 3B1.2 simply because he is the least culpable among several participants in a jointly undertaken criminal enterprise." *United States v. Lockhart*, 37 F.3d 1451, 1455 (10th Cir. 1994); *accord Adams*, 751 F.3d at 1179; *see United States v. Moreno*, 696 F. App'x 886, 894 (10th Cir. 2017) (unpublished) (noting the fact that some participants were "admittedly, more culpable than [the defendant] . . . does not end the debate"); *see also United States v. Castro*, 843 F.3d 608, 612 (5th Cir. 2016) ("Amendment 794 does not provide an affirmative right to a § 3B1.2 reduction to every actor *but* the criminal mastermind." (quoting *United States v. Gomez-Valle*, 828 F.3d 324, 331 (5th Cir. 2016))).

As relevant here, the question of a defendant's qualification for a mitigating-role adjustment—where the defendant's participation in a conspiracy is merely as a courier or mule—has arisen most frequently in the drug-trafficking context. There, we have "consistently" held that courier or mule status does not invariably qualify a defendant for a mitigating-role adjustment. *Martinez*, 512 F.3d at 1276 ("[W]e have consistently 'refused to adopt a per se rule allowing a downward adjustment based solely on a defendant's status as a drug courier.'" (quoting *United States v. Rangel–Arreola*, 991 F.2d 1519, 1524 (10th Cir.

1993))); *see Salas*, 756 F.3d at 1207 ("[Defendant's] courier status alone does not entitle him to an adjustment for a minor or minimal role."); *United States v. Calderon-Porras*, 911 F.2d 421, 423–24 (10th Cir. 1990) ("The mere fact that a defendant is a courier in a drug-smuggling operation does not entitle that defendant to be classified as a minimal participant."). Consequently, we think that the district court here would not have been obliged to grant Ms. Nkome a mitigating-role adjustment simply because she was a "money mule."

To better understand the foundation for the district court's mitigating-role determination and related factual findings, a somewhat detailed consideration of the proceedings leading up to the sentencing hearing will be helpful. In objecting to the PSR before the district court, Ms. Nkome contended that she should receive a mitigating-role adjustment because she was merely "a 'money mule' and her role was limited to picking up money at certain locations and sending the majority of the funds on to others." R., Vol. III, at 169. Using as a touchstone the relevant conduct that the PSR described, Ms. Nkome perceived the various participants in the fraudulent conspiracy as falling into tiers of culpability, with the money mule tier representing the lowest level of culpability.

Specifically, in descending order of culpability—as the PSR's Addendum recorded it—Ms. Nkome reasoned that the participants fell into the following tiers: "Leader organizer"—those "who set up the operation, recruit others to

33

participate, and play a large role in directing and controlling the flow of the money in the operation"; "Online scammers"— those who "use email accounts or other forms of communication to communicate with victims and actively work to convince them of the legitimacy of the items they are purporting to sell"; "Identify forgers"—those who "create fake identification documents that appear real by using real state driver's license forms" and "sell the documents to various people involved in the scheme"; "Mid-level organizers"—those who "recruit the 'money mules' and help provide them with the fake documents they need to pick up the money" and "communicate with higher ups in the organization to see where funds are being sent and pass that information on to their mules to let them know when and where to pick up the money and with what identity"; and "Money Mules"—those who "act at the direction of others to pick up funds sent to various false names." *Id.* at 169–70.[7] Ms. Nkome asserted that she fell into this last,

---

[7]    In her appellate briefing, Ms. Nkome uses different terminology in sorting the conspiracy's participants for purposes of assessing their relative culpability:  "The conspiracy involved (at least) four categories of defendants: (1) international organizers; (2) regional organizers; (3) document forgers; and (4) money mules."  Aplt.'s Opening Br. at 3.  But Ms. Nkome does not suggest that this different terminology bespeaks a different substantive direction in her challenge to the court's denial of her request for a mitigating-role adjustment. She still assigns herself to the lowest rung of the culpability ladder:  money mule. And she still contends that her codefendant, Mr. Nkarakwi, occupied a higher place in the culpability hierarchy than she did—asserting that he "acted as a regional organizer."  *Id.* at 4.

lowest tier of culpability and, by comparison, suggested that her codefendant, Mr. Nkarakwi, was in a tier above her—that is to say, he was a mid-level organizer.

Ms. Nkome also purported to fortify her claim to a mitigating-role adjustment by summarizing her role in the fraudulent conspiracy with tacit reference to the five non-exhaustive factors of Note 3(C) of § 3B1.2.[8]  As

---

[8]    For ready reference, along with their prefatory commentary, we repeat those five non-exhaustive factors here:

> In determining whether to apply subsection (a) [i.e., minimal-participant] or (b) [i.e., minor-participant], or an intermediate adjustment, the court should consider the following non-exhaustive list of factors:
>
> (i)    the degree to which the defendant understood the scope and structure of the criminal activity;
>
> (ii)    the degree to which the defendant participated in planning or organizing the criminal activity;
>
> (iii)    the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;
>
> (iv)    the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;
>
> (v)    the degree to which the defendant stood to benefit from the criminal activity.

U.S.S.G. § 3B1.2, cmt. n.3(C).

recounted in the PSR's Addendum, Ms. Nkome characterized her role in the

following manner:

> Ms. Nkome did not understand the scope and structure of the
> organization, nor did she participate in it. There is no evidence
> that Ms. Nkome participated in the planning or organization of
> the organization. Ms. Nkome did not interact with any victims.
> She did not benefit substantially from the criminal activity. She
> simply went to various businesses, presented as the person who
> was to pick up the funds and sent the money up the chain.

R., Vol. III, at 170. Notably, Ms. Nkome acknowledged that "[s]he received a cut

of the money for her role," but reasoned that this fact did not undermine her claim

to a mitigating-role adjustment. *Id.* In this regard, she seemingly attempted to

downplay the amount of her share of the proceeds of the fraud, noting that

"*assuming the PSR is correct*, Ms. Nkome would have received 20–30% of the

loss associated to her." *Id.* at 171 (emphasis added).

In sum, in objecting to the PSR, Ms. Nkome argued that the evidence

established her "less culpable status in the conspiracy" and her entitlement to a

mitigating-role adjustment. *Id.* The Probation Office, however, disagreed. Its

reasoning helpfully frames the district court's subsequent findings at the

sentencing hearing:

> The defendant outlines the conduct of various individuals such
> as leaders and organizers, online scammers, identity forgers, etc.
> Obviously, this type of scheme can be widespread and involves
> organization at higher levels. However, one person's role does
> not necessarily define that of another, and though comparisons of
> Ms. Nkome to people who performed other roles may be helpful

36

> in distinguishing duties, the comparisons do not demonstrate that she was *substantially less culpable than the average participant*. The U.S. Probation Office deems the defendant to be an average participant.

*Id.* at 172. Notably, the Probation Office highlighted that Ms. Nkome was "only being held accountable for her own conduct; however, she did not perform a limited function in that regard." *Id.* And, though the Probation Office, too, observed that Ms. Nkome received "a 20%-30% money-mule fee associated" with her criminal conduct, significantly, it also noted that Ms. Nkome's codefendant, Mr. Nkarakwi, received an equivalent share of the ill-gotten gains directly attributable to his money-mule activities, and that such a share "appears to be a substantial portion of the proceeds"—that is, a substantial cut, when considering evidence about the "various role players." *Id.* at 172–73. Accordingly, considering the totality of the evidence, the Probation Office determined that Ms. Nkome was "an average participant" in the criminal scheme and not a proper recipient of a mitigating-role adjustment. *Id.* at 172.

During the sentencing hearing, the court heard testimony from the law-enforcement case agent concerning the nature of the fraudulent conspiracy and Ms. Nkome's role in it and then heard arguments from the parties. As relevant here, Ms. Nkome re-urged her objection to the PSR's denial of a mitigating-role adjustment, noting that "[s]he was simply . . . playing her role as money mule" in the fraudulent scheme. *Id.*, R., Vol. II, at 112. She also repeated the substance of

37

her arguments contained in the PSR that applied the five non-exhaustive factors of Note 3(C) to the circumstances of this case. Notably, with respect to the fifth factor—relating to the amount the defendant benefitted from the offense conduct—Ms. Nkome acknowledged "the testimony from the agent that it was his understanding about a 20 to 30 percent cut" of her ill-gotten gains was retained by Ms. Nkome and that this "is not a tiny amount of money." *Id.* at 116.

After hearing the agent's testimony and the parties' arguments, and with the PSR's findings before it, the district court—as we have explicated in Part I.C *supra*—applied Note 3(C)'s five non-exhaustive factors to Ms. Nkome's fraudulent conspiracy and determined that she did not qualify for a mitigating-role adjustment. Recall that the court candidly acknowledged that only "three of the factors disfavor the defendant"—that is, the first (level of understanding of criminal activity's scope and structure), the fourth (level of participation, discretion, and responsibility in the criminal activity), and the fifth (amount of benefit from the criminal activity)—and that "the first factor [made for] a little closer call" than the other two. *Id.* at 129. But the court observed that the Guidelines did not oblige it to mechanically add up the five factors; the adjustment determination was "not a scoreboard kind of thing," and, based on "the totality of the circumstances," Ms. Nkome did not qualify for mitigating-role adjustment. *Id.* In this regard, the court reasoned:

38

> The exact structure of this [criminal activity] from the evidence I heard and the undisputed facts in the presentence report aren't altogether clear, but it seems that this was a conspiracy in an organization that had relatively sophisticated people at the top of it and then a bunch of piece workers, people who may have applied more sophisticated skills like building a website or creating falsified documents or going in to claim the money, *but that does not make them any less culpable than the defendant's culpability here.*
>
> So while I'm -- it's a relatively close question on whether she deserves a minor two-level reduction, I do not find it close on whether she deserves a reduction at the minimal level or intermediate. And given the defendant bears the burden on this, I'm overruling the objection.

*Id.* at 129–30 (emphasis added). And, in response to a question from Ms. Nkome's counsel, the court elaborated on this point and made its reasoning crystalline:

> I think at the two-level [i.e., minor-role adjustment] it is a relatively close question. But when I look at the key concept that is expressed in that [Guidelines] commentary section that says is the defendant substantially less culpable than the average participant in this criminal activity [i.e., Note 3(C)], to me and the way -- on the totality of the circumstances the way I evaluate this conspiracy is there was someone more culpable than Ms. Nkome at the top but then there were a bunch of people of relatively equal culpability. And I cannot say with that view of the conspiracy that [Ms. Nkome] is substantially less culpable than the average participant, and so that's why I overruled the objection.

*Id.* at 131–32.

In substance then, the court divided the criminal participants into two groups: (1) "the relatively sophisticated people at the top," and (2) the "piece

39

workers," who carried out varied tasks in furtherance of the criminal conspiracy. *Id.* at 130. The court assigned Ms. Nkome to the latter group and, from the totality of the evidence, could not discern that she was appreciably less culpable than the participants in this group—indeed, it found that the participants in this group were of "relatively equal culpability" to her. *Id.* at 132. This was so even though they performed different functions for the conspiracy. In reasoning as such, the court tacitly evinced its approval of the Probation Office's conclusion that, "though comparisons of Ms. Nkome to people who performed other roles may be helpful in distinguishing duties, the comparisons do not demonstrate that she was *substantially less culpable than the average participant*." R., Vol. III, at 172.[9] In sum, based on this reasoning and related findings, the court denied Ms. Nkome a mitigating-role adjustment.

We are hard pressed to discern any clear error in the district court's mitigating-role determination, and Ms. Nkome's contrary arguments on appeal are unavailing. As an overarching matter, Ms. Nkome complains that the district court erroneously, with little discussion, "grouped Ms. Nkome with unknown others in an amorphous middle" tier of culpability—below the conspiracy's sophisticated leaders—without appropriately distinguishing her role from those in

---

[9] Indeed, the court expressly adopted the PSR's findings and ordered them "incorporated into" Ms. Nkome's sentencing record. R., Vol. II, at 147.

40

this middle tier who were more culpable than she was. Aplt.'s Opening Br. at 22. And, more specifically, she asserts that an examination of the district court's treatment of the Note 3(C) factors that it weighed against her "explains the error" of the court. *Id.*

We are nevertheless unpersuaded. At the outset, we note that, insofar as Ms. Nkome suggests that the district court erred by not conducting a more fulsome analysis in formulating its culpability groupings of the conspiracy's participants, no such detailed analysis was required. *See Bowen*, 437 F.3d at 1019; *see also Diaz*, 884 F.3d at 916. Then, turning to the heart of the matter, we note that Ms. Nkome's overarching argument effectively faults the district court for failing to discern from the totality of the evidence something akin to the multi-tiered culpability hierarchy that she had advanced in her PSR objection, which distinguished between (among other things) "Mid-level organizers," "Identity forgers," and "Money Mules," like Ms. Nkome—who occupied the bottom tier of culpability. *See* R., Vol. III, at 169–70. But, even assuming that Ms. Nkome's multi-tier culpability hierarchy constitutes one plausible understanding of the factual record, that does not mean that the district court's different record assessment is implausible. *See, e.g.*, *Piper*, 839 F.3d at 1271; *Torres*, 53 F.3d at 1140; *see also Anderson*, 470 U.S. at 574 ("Where there are

41

two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

And indeed the court's reading of the factual record is not implausible. In particular, the district court could plausibly find (as the Probation Office effectively did before it) that the mere fact that other participants performed tasks in furtherance of the conspiracy that may have required "more sophisticated skills[,] like building a website or creating falsified documents," than those of Ms. Nkome—in "claim[ing] the money" that fraud victims sent through the use of multiple false identities —did not mean that Ms. Nkome was less culpable than those other participants. R., Vol. II, at 130. Furthermore, even if these other participants were marginally more culpable than Ms. Nkome, that would "not end the debate" concerning the applicability of the mitigating-role adjustment, *Moreno*, 696 F. App'x at 894, nor mean that the court's ultimate denial of the adjustment was clearly erroneous, *see, e.g.*, *Lockhart*, 37 F.3d at 1455 (noting that "a defendant is not entitled to a reduction under 3B1.2 simply because he is the least culpable among several participants in a jointly undertaken criminal enterprise").

Furthermore, Ms. Nkome's more specific criticisms of the district court's consideration of the three Note 3(C) factors that the court weighed against her evince a similar misunderstanding of the significant latitude that the clear-error

42

standard affords district courts in finding and weighing facts. Beginning with the first factor, concerning a defendant's level of understanding of the criminal activity's scope and structure, Ms. Nkome says that "the district court erred in concluding that this factor weighed against [her] when its own analysis confirmed" that below the participants at the conspiracy's apex were people like her codefendant, Mr. Nkarakwi, who played more diverse parts in the conspiracy than Ms. Nkome did and, consequently, knew more about its scope and structure than she did. Aplt.'s Opening Br. at 22–23. Yet, the fact that Mr. Nkarakwi's more diverse conspiratorial activities allowed him (as well as others like him) to gain more knowledge about the conspiracy's scope and structure than Ms. Nkome would not necessarily render implausible a finding that Ms. Nkome "understood well how this conspiracy worked," especially given her "long run participation in" it. R., Vol. II, at 127. Indeed, rather than undermining such a factual finding of Ms. Nkome's understanding, Mr. Nkarakwi's diverse activities bolstered it on these facts. That is because the court effectively determined that Ms. Nkome's close personal "connection" to Mr. Nkarakwi—not only as a coconspirator, but also as the father of her child—supported an inference that she would have shared a reasonable measure of his knowledge of the conspiracy's scope and structure. *Id.*; *see id.* at 119 (court's inquiry of defense counsel regarding "[t]he nature of the relationship between Ms. Nkome and her . . . co-defendant, because I think

43

that might bear on how I evaluate the extent of her knowledge," and counsel responding that "I know they have a child in common"). Therefore, Ms. Nkome's criticism of the court's analysis of the first factor is unavailing.

And Ms. Nkome fares no better regarding the fourth factor, which relates to a defendant's level of participation, discretion, and responsibility in the criminal activity. She contends that the district court deemed this her "worst" factor because its analysis focused too narrowly on the fact she "was a meaningful[,] repeating[,] persistent participator." Aplt.'s Opening Br. at 19 (quoting R., Vol. II, at 124). According to Ms. Nkome, the court thus effectively ignored the portion of this factor relating to the defendant's "responsibility and discretion" in the criminal activity. *Id.* at 23 (quoting U.S.S.G. § 3B1.2, cmt. n.3(C)). In this respect, Ms. Nkome reasons, the court erred and caused her prejudice "because the evidence showed that she had limited responsibility and almost no discretion in the acts she took." *Id.*

However, the fact that the district court did not expressly refer to the discretion and responsibility facets of the fourth factor does not necessarily mean that the court did not consider them, and indeed we presume that the court did so in properly following advisory Guidelines. *See, e.g.*, *Chevez-Meza*, 854 F.3d at 659; *Vann*, 776 F.3d at 756. Moreover, it would not be a sign of clear error for the court to have accorded greater significance in assaying her degree of

44

culpability under this fourth factor to Ms. Nkome's repeated and substantial participation in the conspiracy's activities than to her arguably limited discretion and responsibility in the conspiracy. *See Piper*, 839 F.3d at 1271 (noting that, under the clear-error standard, "we may not reverse [the trial court's view of the evidence] even if we might have weighed the evidence differently"); *see also Anderson*, 470 U.S. at 574 (noting that "the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently").

Lastly, as to the fifth factor—regarding the amount a defendant stood to benefit from the criminal conduct—Ms. Nkome contends that "[t]he district improperly attributed the full twenty to thirty percent to Ms. Nkome when the evidence (as well as common sense) showed that this amount was split up by the domestic parties (the regional organizers, document forgers, and money mules) before 'the rest would be forwarded back to Cameroon.'" Aplt.'s Opening Br. at 24 (quoting R., Vol. II, at 107). Furthermore, "[w]hile Ms. Nkome certainly profited from her involvement" in the criminal activity and made "not a tiny amount of money" for her criminal labors, as she reasons, it would be wrong to consider her "a stakeholder in the larger criminal activity." *Id.*

Yet, not only is Ms. Nkome's argument regarding this fifth factor curious and plagued by a preservation problem, it is also otherwise unpersuasive. More

specifically, Ms. Nkome never challenged in the district court the accuracy of the PSR's clear finding that Ms. Nkome herself received twenty to thirty percent of the losses that she personally caused through her criminal conduct. Indeed, in lodging her objections to the PSR, Ms. Nkome "assum[ed]" this finding was correct. R., Vol. III, at 171. And, during the sentencing hearing, she specifically acknowledged "the testimony from the agent that it was his understanding about a 20 to 30 percent cut" of her ill-gotten gains was retained by Ms. Nkome and, without challenging this testimony, conceded that this "is not a tiny amount of money." *Id.*, Vol. II, at 116. Not surprisingly then, the court analyzed the fifth factor by recognizing that Ms. Nkome and the government "agree[d] she profited in the range of 20 to 30 percent of that gross theft or gross loss." *Id.* at 129.

Given Ms. Nkome's litigation conduct, she forfeited—at the very least—any challenge based on the court's ostensible error in calculating her share of the gain from the conspiracy, if she did not waive the challenge outright. *Compare United States v. Carrasco-Salazar*, 494 F.3d 1270, 1272 (10th Cir. 2007) (noting that "forfeiture is the failure to make the timely assertion of a right"), *with United States v. Cruz-Rodriguez*, 570 F.3d 1179, 1182 (10th Cir. 2009) ("We conclude that [the defendant] waived appellate review of this argument by his intentional litigation decisions before the district court."). And because Ms. Nkome does not even acknowledge her lack of preservation of this

argument in her appellate briefing, much less advance an argument under the well-established plain-error rubric, she has effectively waived our further consideration of this argument. *See, e.g.*, *United States v. Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019).

As for Ms. Nkome's contention that she should not have been considered a "stakeholder" in the conspiracy, the apparent thrust of this argument is that the district court erred by not finding that Ms. Nkome was "a defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks"—a class of defendants that the Guidelines commentary provides "should be considered for an adjustment" under § 3B1.2. U.S.S.G. § 3B1.2, cmt. n.3(C)(v).[10] We disagree.

The district court's factual findings—which Ms. Nkome has not demonstrated are implausible—paint a very different picture of Ms. Nkome's financial benefit from the conspiracy. Rather than find, for example, that Ms. Nkome periodically received small flat-fee payments for performing certain minor tasks for the conspiracy, the court found that Ms. Nkome had a "significant" share

---

[10] In briefing this argument, Ms. Nkome cites to 3B1.2, cmt. n.3(C)(iv), *see* Aplt.'s Opening Br. at 24, but this almost certainly is a mistake because subpart (iv) deals with a defendant's participation, discretion, and responsibility in the criminal activity, whereas subpart (v) addresses the extent of a defendant's benefit in the criminal activity and includes the "paid to perform certain tasks" language that Ms. Nkome quotes in her brief.

in the conspiracy's gross proceeds—that is, "a significant . . . piece of the action" in the range of "20 to 30 percent." R., Vol. II, at 129. Notably, the PSR—upon which the district court expressly relied, *see id.* at 13, 130—found that Ms. Nkome's share was equal to that of her codefendant, Mr. Nkarakwi, for his money-mule activities, even though he undisputedly played a more extensive role in furthering the conspiracy's interests, *see* R., Vol. III, at 172. Indeed, even Ms. Nkome has been obliged—before the district court and on appeal—to concede that she made "not a tiny amount of money" for her conspiratorial endeavors. Aplt.'s Opening Br. at 24; R., Vol. II, at 116. In light of these findings, the district court could have quite reasonably rejected any suggestion that the fifth factor favored Ms. Nkome because she had no "proprietary interest in the criminal activity." U.S.S.G. § 3B1.2, cmt. n.3(C)(v). Thus, Ms. Nkome's arguments concerning this factor are flawed by preservation concerns and unpersuasive, and we reject them.

In sum, we discern no merit in Ms. Nkome's second, factual challenge to the district court's denial of a mitigating-role adjustment.

## IV

For the foregoing reasons, we **AFFIRM** the district court's sentencing judgment.